Filed 10/22/13

**CERTIFIED FOR PUBLICATION**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Placer)

----

| | |
|---|---|
| RICHARD BUSHELL et al., | C070643 |
| Plaintiffs and Appellants, | (Super. Ct. No. SCV0028814) |
| v. | |
| JPMORGAN CHASE BANK, N.A., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Placer County, Michael A. Jacques, Court Commissioner. Reversed.

United Law Center, John S. Sargetis and Jon L. Oldenburg for Plaintiffs and Appellants.

AlvaradoSmith, Theodore E. Bacon and Ricardo Diego Navarrette for Defendant and Respondent.

In this action arising from a home foreclosure, the trial court sustained, without leave to amend, defendant lender's demurrer to plaintiff borrowers' complaint. The complaint alleges causes of action for breach of contract, promissory estoppel, and fraud based on intentional misrepresentation or false promise. Specifically, plaintiffs allege that defendant, under a trial modification mortgage plan, offered to permanently modify

1

the plaintiffs' mortgage loan, provided plaintiffs complied with the terms of the trial modification plan by returning certain requested documents, making timely trial modification payments, and qualifying under a federal program that seeks to reduce home foreclosures, the Home Affordable Mortgage Program (hereafter, HAMP).

Two recent appellate decisions provide guidance on this subject, one from the California Court of Appeal, Fourth Appellate District, Division Three (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780 (*West*)) and the other from the federal Seventh Circuit Court of Appeals (*Wigod v. Wells Fargo Bank, N.A.* (7th.Cir. 2012) 673 F.3d 547 (*Wigod*)). These two decisions, which were issued after the trial court ruled here, concluded that when a borrower has alleged that he or she has complied with all the terms of a trial modification plan offered under HAMP—including making all required payments and providing all required documentation—and if the borrower's representations on which the modification is based remain true and correct, the lender or loan servicer (collectively hereafter, the lender) must offer the borrower a good faith permanent modification; and if the lender fails to do so, the borrower may sue the lender, under state law, for breach of contract of the trial modification plan, among other causes of action.

We conclude plaintiffs have sufficiently alleged causes of action for breach of contract, promissory estoppel, and fraud based on false promise. Therefore, we shall reverse on those bases.[1]

---

[1] Before and at oral argument, the parties stated they have settled this case and requested this appeal be dismissed. Appellate courts have discretion to decide the merits of an appeal rendered moot by settlement, if the appeal poses an issue of broad public interest that is likely to recur. (*People v. Eubanks* (1996) 14 Cal.4th 580, 584, fn. 2; see also Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2012) ¶¶ 8:210 to 8:211, p. 8-147 (rev. #1, 2012) [and cases cited therein].) We exercise such discretion here to decide the merits of this appeal.

## STANDARD OF REVIEW AND FACTUAL BACKGROUND

In reviewing a demurrer-based judgment of dismissal, we determine, independently of the trial court, whether, assuming the facts alleged in the complaint are true, a cause of action has been or can be stated. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; *Rogoff v. Grabowski* (1988) 200 Cal.App.3d 624, 628.) We may also consider judicially noticeable matters and facts in the exhibits attached to the complaint. (*Picton v. Anderson Union High School Dist*. (1996) 50 Cal.App.4th 726, 732-733.)

The complaint at issue here, the plaintiffs' first amended complaint, alleges the following facts.

In May 2004, plaintiffs Richard and Susan Bushell obtained a loan from then defendant Washington Mutual Bank to purchase a home in Roseville. Plaintiffs executed a deed of trust encumbering the property as security. Subsequently, defendant JPMorgan Chase Bank, N.A., acquired certain assets and liabilities of Washington Mutual, including plaintiffs' loan and deed of trust (we will refer collectively to these defendants as Chase).[2] In December 2008, plaintiffs defaulted on their loan.

In May 2009, plaintiffs received from Chase a trial modification plan (called a "Trial Period Plan" or TPP), which stated in part: "If you qualify under the federal government's Home Affordable Modification [P]rogram [(HAMP)] and comply with the terms of the [trial modification plan], we will modify your mortgage loan and you can avoid foreclosure." In the trial modification plan, Chase requested that plaintiffs (1) sign and return certain documents (the plan itself, if they accepted it; a financial hardship affidavit; a tax return disclosure form; and documentation to verify previously stated income), and (2) submit the first trial period payment (in the amount of $1,420.31,

_____

[2] Defendant JPMorgan Chase Bank, N.A., acquirer of defendant Washington Mutual Bank, brought the demurrer at issue.

3

calculated from income and loan information Chase already had and calculations Chase had already performed pursuant to HAMP guidelines). (See U.S. Dept. Treasury, HAMP Supplemental Directive No. 09-01, Apr. 6, 2009, pp. 2-5, 8-10, 14-15 (hereafter, Supplemental Directive 09-01).) Plaintiffs signed and provided all the requested documents and made the first trial period payment.

In June 2009, plaintiffs received a letter from Chase confirming the trial modification plan and specifying in part: "If you make all [3] trial period payments on time [under the trial modification plan] and comply with all of the applicable [HAMP] program guidelines, you will have qualified for a final [permanent] modification." The letter also contained four coupons with which to return the trial modification payments, and instructed plaintiffs to continue making the trial modification payments after the first three in the event of a paperwork delay.

After making the first four trial period payments, plaintiffs inquired about the status of their loan modification. Chase advised them to continue making the trial payments. Plaintiffs did, making 26 trial modification payments between June 2009 and August 2011.

Plaintiffs contacted Chase multiple times between November 2009 and June 2010, inquiring about the status of their loan modification. Between November and December 2009, Chase indicated it was processing the paperwork. Then, on December 30, 2009, when plaintiffs again inquired, Chase told plaintiffs the loan modification had been denied " 'by the investor' " and Chase could not accept any more payments. In the ensuing months, plaintiffs requested written explanation, but received nothing. Plaintiffs called Chase and were told to stop making payments because Chase was " 'crunching the numbers' " for the modification and payment schedule, and additional payments at that point would skew the outcome. And then in June 2010, plaintiffs were told that their file had been reviewed and cleared to resume the trial modification payments, which

4

plaintiffs resumed. In November 2010, plaintiffs received a letter from Chase requesting updated information. This was the first written communication from Chase since the trial modification plan provided to plaintiffs in May 2009 and the confirming letter sent in June 2009. Plaintiffs provided the requested information in person on December 3, 2010. The next written communication plaintiffs received from Chase was on January 27, 2011—a notice of trustee's sale regarding the property (posted on their front door).

## PROCEDURAL BACKGROUND

After Chase demurred to plaintiffs' original complaint, plaintiffs filed their first amended complaint alleging (1) breach of contract, including breach of the implied covenant of good faith and fair dealing, (2) promissory estoppel, and (3) fraud— intentional misrepresentation and false promise.

The trial court, which ruled before *West* and *Wigod* were decided, sustained Chase's demurrer without leave to amend and dismissed the case, finding: (1) as to breach of contract and the implied covenant of good faith and fair dealing—the trial modification plan was not, on its face, a binding contract for a loan modification; plaintiffs did not allege they qualified under HAMP; and the implied covenant theory fell with the lack of a contract; (2) as to promissory estoppel—the alleged promise was conditional rather than clear and unambiguous as required; and plaintiffs failed to allege detrimental reliance (damages) because monthly mortgage payments that plaintiffs were already obligated to make cannot constitute damages; and (3) as to fraud—plaintiffs failed to allege their facts with the requisite level of specificity, and similarly failed to allege detrimental reliance.

This appeal followed.

5

## DISCUSSION

### I. Plaintiffs State a Cause of Action for Breach of Contract Including Breach of the Implied Covenant of Good Faith and Fair Dealing

#### *A. Breach of Contract*

To allege a cause of action for breach of contract, a plaintiff must allege, "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." (*Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 830.)

The alleged contract here is the trial modification plan—the Trial Period Plan or TPP—that Chase provided plaintiffs under HAMP. As noted, the principal contractual language of the TPP provides: "If you qualify under the federal government's Home Affordable Modification [P]rogram [(HAMP)] and comply with the terms of the [TPP], we will modify your mortgage loan and you can avoid foreclosure"; and "If you make all [3] trial period payments on time and comply with all of the applicable [HAMP] guidelines, you will have qualified for a final modification" (this latter quote is from the TPP-confirming letter Chase sent plaintiffs in June 2009).

Plaintiffs contend that the TPP here constituted a valid, binding contract entitling them to a permanent loan modification under HAMP upon their performance of certain conditions precedent (complying with the terms of the TPP and qualifying under HAMP); that they performed those conditions precedent; and that Chase breached the contract by not providing them a permanent modification.

Chase counters that no contract existed; rather, Chase gave "nothing more than a promise to *consider* [plaintiffs] for a permanent modification, a mere 'agreement to agree' (on conditions)," which is "unenforceable as a matter of law." (Italics added.) Chase explains that qualification under HAMP was a condition precedent to permanent modification, and plaintiffs failed to allege they qualified under that program.

6

As is evident from the parties' respective contentions, the allegation of a breach of contract cause of action here turns on whether plaintiffs have alleged performance of certain conditions precedent—complying with the TPP's terms and qualifying under HAMP—necessary to form a TPP contract to permanently modify the terms of their loan. Consequently, we must understand HAMP to understand the contractual status, if any, of the TPP here. We pause now to examine HAMP.[3]

1. <u>HAMP</u>.

When financial markets nearly collapsed in the late summer and early fall of 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 (Pub.L. No. 110-343; 122 Stat. 3765). (*Wigod, supra,* 673 F.3d at p. 556.) The centerpiece of this act was the federal Troubled Asset Relief Program (TARP) which, in addition to providing a massive infusion of liquidation to the banking system, required the United States Department of the Treasury (hereafter, Treasury) to implement a plan to minimize home foreclosures. (See *Wigod*, at p. 556; 12 U.S.C. § 5219(a).)

That plan was HAMP, introduced in February 2009, and funded by a $50 billion set-aside of TARP monies to induce lenders to refinance mortgages to reduce monthly payments for struggling homeowners. (*Wigod*, *supra*, 673 F.3d at p. 556.) Specifically, HAMP enables certain homeowners who are in default or at imminent risk of default to obtain "permanent" loan modifications, by which their monthly mortgage payments are reduced to no more than 31 percent of their gross monthly income for a period of at least

---

[3] Similar to the position it took in *West*, Chase does not argue lack of offer, acceptance, consideration, or any other element necessary to create an enforceable contract, aside from its contention noted above. (See *West*, *supra*, 214 Cal.App.4th at p. 796 [noting that many federal decisions have concluded that a trial loan modification under HAMP constitutes a valid, enforceable contract under state law—including two decisions applying California law—at least at the pleading stage of the litigation (see cases cited therein)].)

five years.  Lenders receive from the government a $1,000 incentive payment for each permanent HAMP modification, along with other incentives.  (*West, supra,* 214 Cal.App.4th at pp. 787-788; *Wigod, supra*, 673 F.3d at pp. 556-557, 565; Supplemental Directive 09-01, *supra*, pp. 2-6, 8-10, 14-18; see Chiles & Mitchell, *HAMP*: *An Overview of the Program and Recent Litigation Trends* (2011) 65 Consumer Fin. L.Q. Rep. 194, 194-197 (hereafter, Chiles & Mitchell).)

Supplemental Directive 09-01, a regulation the Treasury issued in April 2009, delineates HAMP's eligibility requirements and modification procedures.  (Supplemental Directive 09-01, *supra*, pp. 2-18.)  Lenders must perform HAMP loan modifications in accordance with Treasury regulations.  (*West*, *supra*, 214 Cal.App.4th at p. 787; *Wigod, supra,* 673 F.3d at p. 556.)

As for HAMP's eligibility requirements, under Supplemental Directive 09-01, before a lender offers a TPP to a distressed borrower, the lender (1) has already found that the borrower satisfies certain simple threshold requirements under HAMP regarding the basic nature of the loan obligation (e.g., a certain loan amount balance; property is primary residence; monthly mortgage payment greater than 31 percent of monthly gross income); (2) has already calculated a trial modification payment amount using a "waterfall" method of specified steps that drops the borrower's monthly mortgage payment to the HAMP target figure of 31 percent of monthly gross income; and (3) most significantly from the lender's perspective, has already determined, pursuant to application of a net present value (NPV) test based in part on income/financial representations provided by the borrower, that it is more profitable to modify the loan under HAMP than to foreclose upon it.  (*West, supra,* 214 Cal.App.4th at pp. 787-788; *Wigod, supra,* 673 F.3d at pp. 556-557, 565; Supplemental Directive 09-01, *supra*, pp. 2-5, 8-10, 14-18; see Supplemental Directive 09-01, p. 4 ["If the NPV result for the modification scenario is greater than the NPV result for no modification, . . . the [lender]

8

MUST offer the modification," even if a third party investor is involved (emphasis in original)]; see Chiles & Mitchell, *supra*, 65 Consumer Fin. L.Q. Rep., pp. 194-197.) Furthermore, Supplemental Directive 09-01 specifies that, upon receiving the signed TPP from the borrower (with the income verification documents), the lender "must confirm" that the borrower continues to meet these HAMP eligibility criteria and, if not, the lender "should promptly communicate" that fact in writing to the borrower "and consider the borrower for another foreclosure prevention alternative." (Supplemental Directive 09-01, *supra*, p. 15.)

In short, then, when a lender offers a TPP to a distressed borrower, the lender effectively has already determined that the borrower qualifies for HAMP, assuming that the borrower's representations on which modification is based remain true and correct. (Supplemental Directive 09-01, *supra*, pp. 15, 17-18.)

After determining a borrower qualifies under HAMP in this manner, the lender implements the HAMP modification process in two steps.

In step one, the lender (1) provides the borrower with a TPP that sets forth the trial payment terms the lender has calculated using the waterfall method; (2) instructs the borrower to sign and return the TPP, a financial hardship affidavit, and income verification documents (if not previously obtained from the borrower); and (3) requests the first trial payment.[4] (*West*, *supra*, 214 Cal.App.4th at pp. 787-788; *Wigod*, *supra*,

---

[4] The Treasury originally projected that 3 to 4 million homeowners would receive permanent modifications under HAMP. Yet one year into the program, only 170,000 homeowners had received permanent modifications—fewer that 15 percent of the 1.4 million homeowners who had been offered trial plans. (*Wigod*, *supra*, 673 F.3d at p. 557, fn. 2.) Prior to June 1, 2010 (which encompasses the time period at issue here), lenders were permitted to offer a borrower a TPP based upon the borrower's unverified income/financial representations. (Supplemental Directive 09-01, *supra*, pp. 5, 17.) This apparently led to too few permanent modifications, so the Treasury now requires lenders to fully verify a borrower's financial information before offering a TPP. (U.S. Dept.

673 F.3d at p. 557; Supplemental Directive 09-01, *supra*, pp. 14-15; Chiles & Mitchell, *supra*, 65 Consumer Fin. L.Q. Rep., pp. 196-197.)

As for step two of the HAMP modification process, after the trial period, if the borrower has complied with all terms of the TPP—including making all required trial payments and providing all required documentation—and if the borrower's representations on which modification is based remain true and correct, the lender "must offer" the borrower a permanent loan modification (in step two, the lender calculates the terms of the permanent modification using the verified income information). (*West*, *supra*, 214 Cal.App.4th at pp. 786, 788; *Wigod*, *supra*, 673 F.3d at p. 557; Supplemental Directive 09-01, *supra*, pp. 14-15; Chiles & Mitchell, *supra*, 65 Consumer Fin. L.Q. Rep., pp. 196-197.)[5]

This "must offer" mandate is because, as *West* explains, citing *Wigod*, "When [a lender] received public tax dollars under [TARP], it agreed to offer TPP's and loan modifications under HAMP according to [regulations] . . . issued by the Department of the Treasury. (*Wigod*, *supra*, 673 F.3d at p. 556.) Under . . . [the] HAMP [S]upplemental [D]irective 09-01 [regulation] . . . , if the lender approves [(i.e., offers)] a

---

Treasury, HAMP Supplemental Directive No. 10-01, June 1, 2010.) Through December 2010, however, only approximately 580,000 borrowers had received permanent HAMP modifications, causing many to question the effectiveness of (and lenders' compliance with) the program. (Chiles & Mitchell, *supra*, 65 Consumer Fin. L.Q. Rep., pp. 194-195.)

[5] The TPP payment may be a good faith "estimate" of the permanent modification payment. (See *Wigod, supra,* 673 F.3d at p. 565; *West, supra,* 214 Cal.App.4th at p. 798.) Because the monthly payment amount under the permanent modification will be based on the most recent verified income documentation, the monthly payment due under the permanent modification may differ somewhat from the monthly payment due under the TPP, but the permanent modification payment amount must be determined in good faith. (Supplemental Directive 09-01, *supra*, pp. 18, 15; see *West, supra,* 214 Cal.App.4th at p. 798.) See footnote 4, *ante*.

TPP, and the borrower complies with all the terms of the TPP and all of the borrower's representations remain true and correct, the lender *must offer* a permanent loan modification. (*Wigod*, *supra*, at p. 557.) [Supplemental] Directive 09-01, *supra*, at page 18 states: 'If the borrower complies with the terms and conditions of the [TPP], the loan modification will become effective on the first day of the month following the trial period . . . .' " (*West*, *supra*, 214 Cal.App.4th at pp. 796-797, fn. omitted.)

With this HAMP primer in mind, we turn to plaintiffs' breach of contract allegations.

2. <u>Breach of contract cause of action</u>.

Plaintiffs have attached to, and incorporated within, their first amended complaint their TPP with Chase, which states as pertinent, "If you qualify under the federal government's Home Affordable Modification [P]rogram [(HAMP)] and comply with the terms of the [TPP], we will modify your mortgage loan and you can avoid foreclosure"; "If you make all [3] trial period payments on time and comply with all of the applicable [HAMP] guidelines, you will have qualified for a final [permanent] modification"; and "LET US KNOW THAT YOU ACCEPT THIS OFFER— [¶] Please let us know no later than May 23, 2009 that you accept the [TPP] by returning the signed [TPP], along with other required documents [(financial hardship affidavit; tax return disclosure form; certain documents to verify income)] and first payment."

As we have just seen, in light of the HAMP Supplemental Directive 09-01, if a borrower complies with all terms of the TPP—including making all required payments and providing all required documentation—and if the borrower's representations on which modification is based remain true and correct, the lender *must offer* the borrower a good faith permanent loan modification, because the borrower has qualified under HAMP and has complied with the TPP.

11

In their first amended complaint, plaintiffs allege: They accepted Chase's TPP offer; they "provid[ed] all the [TPP] documents" Chase requested; they made four timely trial payments as initially called for by the TPP and an additional 22 more through August 2011 (as directed by Chase in response to plaintiffs' repeated requests of what to do next); they "qualif[ied] for the modification under HAMP"; in late December 2009, they were told the loan modification had been denied " 'by the investor' "; in June 2010, Chase told plaintiffs they were cleared to resume making the trial modification payments, and plaintiffs did so, timely making all required payments—Chase also stated that plaintiffs should have a loan modification offer by mid-July 2010, and Chase apologized that the loan modification process "had taken so long and explained that a lot had 'dropped through the cracks' in the transition from [Washington Mutual] to Chase but now things were processing well"; in December 2010, plaintiffs provided " 'updated' information" as requested by Chase to continue the modification processing; and the only written communication plaintiffs received thereafter from Chase was a notice of trustee's sale in January 2011.[6]

Consequently, plaintiffs have alleged in their first amended complaint that they have complied with all terms of the TPP—including making all required payments, providing all required documentation, and maintaining the integrity of their modification-based representations, and they have alleged that they "qualif[ied] for the modification under HAMP" (given Chase's offer of a TPP to them, and no "prompt[] communicat[ion]" to the contrary from Chase). (Supplemental Directive 09-01, *supra*, p. 15.) As a result, plaintiffs have alleged a cause of action for breach of contract under

---

[6] Actually, this summary of plaintiffs' allegations sanitizes those allegations, which describe Chase's actions along the lines of a prolonged bureaucratic nightmare of Kafkaesque proportions. And, in many of their TPP dealings, it was plaintiffs, rather than Chase, who maintained contact to ensure TPP compliance.

California law: They have alleged that Chase breached the TPP contract by failing to offer plaintiffs a good faith permanent loan modification.

Similar TPP language in *Wigod*, and even less contractually certain TPP language in *West*, yielded similar conclusions that the respective borrowers in those two decisions alleged a cause of action against the lender for breach of the TPP sufficient to overcome a demurrer.

In *Wigod*, the TPP stated that if the borrower complied with the TPP, and the borrower's TPP representations continued to be true, then the lender "w[ould] provide . . . a [permanent] Loan Modification Agreement." (*Wigod*, *supra*, 673 F.3d at p. 558.)

In *West*, the TPP stated that if the borrower " 'compl[ied] with all the terms of [the TPP], [the lender would] consider a permanent workout solution for [the borrower's] loan once the [TPP] has been completed.' " (*West*, *supra*, 214 Cal.App.4th at p. 789.) As evident, the TPP in *West* did not expressly include the proviso that the lender "would offer a permanent loan modification if [the borrower] complied with [the TPP's] terms." (*West, supra,* 214 Cal.App.4th at p. 797.) But, said *West*, such a proviso is necessarily imposed by HAMP Supplemental Directive 09-01 to make the TPP lawful. (*West*, at pp. 797-798; see Civ. Code, § 1643 ["A contract must receive such an interpretation as will make it lawful," if to do so does not violate parties' intent], cited by *West,* at p. 797; see also *Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1005-1006, 1013-1015 [appellate court found, without resort to HAMP regulatory directives, that a TPP constituted an enforceable contract under state law contract principles governing conditions precedent; the TPP in *Barroso* stated, " 'If you comply with the

13

terms of the Home Affordable Trial Period Plan and the Modification Agreement, we will modify your mortgage loan . . . .' " (*Barroso*, p. 1005)].)[7]

As noted, Chase contends that the TPP here reveals "nothing more than a promise to *consider* [plaintiffs] for a permanent modification, a mere 'agreement to agree' (on conditions)," which is "unenforceable as a matter of law." (Italics added.) Chase points to conditional language in the TPP to support its contention. For example, the TPP includes statements such as, "If you qualify under the federal government's Home Affordable Modification [P]rogram"; "To . . . see if you qualify for a Home Affordable Modification"; "The Trial Period Plan is the first step. Once we are able to confirm your income and eligibility for the program"; and "Please note . . . that your modification will not be effective unless you meet all of the applicable conditions, including making all trial period payments."

While this language cited by Chase may be conditional, this language reflects, as we have seen from our primer on HAMP, a promise conditioned on plaintiffs' (1) providing the appropriate paperwork, (2) making full and timely trial payments, and (3) maintaining the integrity of their modification-based representations, obligations that plaintiffs have alleged in their first amended complaint they satisfied here. Plaintiffs have alleged they qualify under HAMP through receiving the TPP offer and performing these conditions.

---

[7] Recently, the federal Ninth Circuit Court of Appeals, in applying California law in *Corvello v. Wells Fargo Bank, NA* (9th Cir., Aug. 8, 2013, Nos. 11-16234, 11-16242) ___ F.3d ___ [2013 U.S. App. Lexis 16415, 2013 WL 4017279], followed *Wigod* and *West* to reverse a demurrer-like dismissal, concluding the defendant bank there was contractually obligated under the terms of the TPP to offer a permanent modification to borrowers who complied with the TPP by submitting accurate documentation and making trial payments.

We conclude plaintiffs have alleged that the TPP constituted an enforceable contract under California law, that plaintiffs have performed the conditions precedent to that contract, and that Chase breached that contract by failing to offer plaintiffs a good faith permanent loan modification.[8] That leaves only the element of damages to allege a cause of action for breach of contract. (*Reichert v. General Ins. Co.*, *supra*, 68 Cal.2d at p. 830.)

Chase argues that plaintiffs cannot allege damages, because all plaintiffs did was to make monthly mortgage payments they were already obligated to make. Plaintiffs allege they were damaged by the considerable time they spent repeatedly contacting Chase and repeatedly preparing documents at Chase's request; by discontinuing efforts to pursue a refinance from other financial institutions or to pursue other means of avoiding foreclosure (such as bankruptcy restructuring, or selling or renting their home); by having their credit reports further damaged; and by losing their home and making it unlikely they could purchase another one. We conclude plaintiffs have adequately alleged damages. (See *West*, *supra*, 214 Cal.App.4th at p. 795.)

We conclude plaintiffs have alleged a breach of contract cause of action in their first amended complaint.[9]

---

[8] *West* quoted *Wigod* as follows, " '[a]lthough [Chase] may have . . . some limited discretion to set the precise terms of an offered permanent modification, [Chase] was certainly required to offer *some* sort of good-faith permanent modification to [the plaintiffs] consistent with HAMP guidelines. It has offered none.' " (*West*, *supra*, 214 Cal.App.4th at p. 798, quoting *Wigod*, *supra*, 673 F.3d at p. 565.) Indeed, here, instead of a good faith permanent modification offer, plaintiffs allege they were greeted with a notice of trustee's sale.

[9] Congress did not create, in HAMP, a private federal right of action for borrowers against lenders. (*Wigod*, *supra*, 673 F.3d at p. 559, fn. 4.) But as *Wigod* explained, "The issue here, however, is not whether federal law itself provides private remedies, but whether it displaces remedies otherwise available under state law. The absence of a private right of action from a federal statute provides no reason to dismiss a claim under a

15

### *B. Breach of the Implied Covenant of Good Faith and Fair Dealing*

The law implies in every contract a covenant of good faith and fair dealing, meaning that neither party will do anything which will injure the right of the other to receive the contract's benefits. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720; *Tilbury Constructors, Inc. v. State Comp. Ins. Fund* (2006) 137 Cal.App.4th 466, 474.)

Plaintiffs allege in the first amended complaint that "[Chase] . . . breached the contract by not working with Plaintiffs during the modification process in good faith." We conclude that plaintiffs have adequately alleged a breach of the covenant of good faith and fair dealing.

Chase was required to act in accord with the TPP and HAMP regulations. Therefore, Chase was required to offer plaintiffs a good faith permanent modification of their loan given that plaintiffs have alleged they complied with the TPP and qualified under HAMP.

As we have seen in discussing the breach of contract cause of action, in light of HAMP Supplemental Directive 09-01, if a borrower complies with his or her TPP and if the borrower's representations on which loan modification is based remain accurate, then the lender must offer the borrower a good faith permanent loan modification. Here, plaintiffs have alleged they met these conditions.

But according to plaintiffs, Chase did not hold up its end of the bargain—it never offered plaintiffs a permanent modification. On the contrary, Chase is alleged to have strung plaintiffs along, without confirming or denying a permanent modification, while

---

state law just because [the claim] refers to or incorporates some element of the federal law. . . . To find otherwise would require adopting the novel presumption that where Congress provides no remedy under federal law, [traditional] state law [principles] may not afford one in its stead." (*Wigod*, *supra*, 673 F.3d at p. 581.)

16

plaintiffs made 26 trial period payments, only to be slapped with a notice of trustee's sale when they reached the end of Chase's bureaucratic maze. Plaintiffs' TPP further stated that "[a]s long as [plaintiffs] comply with the terms of the [TPP], [Chase] will not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started." Plaintiffs have sufficiently alleged a contractual breach of the implied covenant of good faith and fair dealing.

## II. Plaintiffs State a Cause of Action for Promissory Estoppel

The elements of promissory estoppel are (1) a clear and unambiguous promise by the promisor, and (2) reasonable, foreseeable and detrimental reliance by the promisee. (*Laks v. Coast Fed. Sav. & Loan Assn.* (1976) 60 Cal.App.3d 885, 890.)

The only disputed elements here are whether plaintiffs alleged a clear and unambiguous promise, and detrimental reliance.

The allegation of the TPP contract—through which a permanent modification was to be offered if certain conditions were met—meets the element of a clear and unambiguous promise.

As for detrimental reliance, Chase again argues that plaintiffs did not incur damages because they were already obligated to make their monthly mortgage payments.

Similar to the damages they allege resulted from the contractual breach, however, plaintiffs allege they detrimentally relied on Chase's promise to permanently modify their loan by repeatedly contacting Chase, by repeatedly preparing documents at Chase's request, by discontinuing efforts to pursue a refinance from other financial institutions or to pursue other means of avoiding foreclosure, and by losing their home and making it unlikely they could purchase another one. Consequently, plaintiffs have adequately alleged detrimental reliance to sustain a promissory estoppel cause of action. (See *West*, *supra*, 214 Cal.App.4th at p. 795.)

17

### III. Plaintiffs State a Cause of Action for Fraud Based on False Promise

In their first amended complaint, plaintiffs allege as pertinent, (1) Chase made affirmative misrepresentations of material fact and/or false promises to plaintiffs, including that plaintiffs would be offered a permanent loan modification under certain conditions; (2) the TPP states, " 'As long as [plaintiffs] comply with the terms of the [TPP], [Chase] will **not start** . . . foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started' " (emphasis added in first amended complaint); (3) Plaintiffs complied with the terms of the TPP and have made 26 of those payments; (4) despite this, Chase issued a notice of trustee's sale to foreclose; and (5) Chase deceived plaintiffs for its own financial gain.

These allegations are sufficient to state a fraud cause of action for false promise. Under California statutory law, "[a] promise made without any intention of performing it" is actual fraud. (Civ. Code, § 1572, subd. 4; see Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 293, p. 320.)

Chase disagrees on two grounds.

First, Chase argues that plaintiffs' false promise allegations lack the specificity required to plead a fraud cause of action against a corporate defendant; specifically, the allegations fail to identify the person(s) who allegedly made the false promises on Chase's behalf.

Plaintiffs have met the specificity requirement. The TPP, including the TPP-confirming letter from Chase, is attached to the first amended complaint, and plaintiffs did not have to specify the Chase personnel who prepared these documents because that information is uniquely within Chase's knowledge. (See *West*, *supra*, 214 Cal.App.4th at p. 793.)

And, second, Chase again argues that plaintiffs were not damaged, because all they did was make monthly mortgage payments they were already obligated to make.

For the reasons we have expressed in discussing damages involving the causes of action for breach of contract and promissory estoppel, we disagree.

## DISPOSITION

The judgment is reversed as to the causes of action for breach of contract (including breach of the covenant of good faith and fair dealing), promissory estoppel, and fraud based on false promise.  The judgment is affirmed as to the cause of action for fraud based on intentional misrepresentation.  Plaintiffs are awarded their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)  (**_CERTIFIED FOR PUBLICATION_**)


                BUTZ            , J.


We concur:


      NICHOLSON     , Acting P. J.


      MAURO       , J.

19