Filed 7/2/15  White v. Wells Fargo Home Mortgage CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MAURA WHITE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>WELLS FARGO HOME MORTGAGE,<br><br>    Defendant and Respondent. | A140195<br><br>(Alameda County<br>Super. Ct. No. HG12648600) |

**I.**

**INTRODUCTION**

Maura White sued Wells Fargo Home Mortgage (Wells Fargo) for refusing to permanently modify her payment obligations under her home mortgage loan.  After sustaining a demurrer to White's second amended complaint without leave to amend, the trial court entered judgment in favor of Wells Fargo.  We affirm.

**II.**

**STATEMENT OF FACTS**

**A.  Background[1]**

In July 2003, White obtained a $397,000 adjustable rate mortgage loan from World Savings Bank, FSB (the loan).  The loan was secured by a deed of trust against White's residential property in Castro Valley.  In 2008, World Savings Bank changed its

---

[1] The trial court took judicial notice of documentary evidence pertaining to the background of this case, which is included in the Appellant's Appendix and referenced by the parties in their briefs.

1

name to Wachovia Mortgage, FSB, and, in 2009, Wells Fargo merged with Wachovia and became the beneficial owner of White's loan.

According to an April 2010 "Notice of Default and Election to Sell Under Deed of Trust," White stopped making payments on her loan in May 2009. A trustee sale was noticed for November 8, 2010. However, White avoided foreclosure by filing a Chapter 13 bankruptcy petition on November 2, 2010.

In May 2011, the bankruptcy court confirmed White's Chapter 13 bankruptcy plan. In paragraph 4 of that plan, White stated that she would make payments on her loan in the amount $2,400 a month directly to the lender. Notwithstanding this unqualified representation, White made a seemingly inconsistent proposal in paragraph 7 of her plan, which stated: "Debtor is seeking loan modification from Wachovia/Wells Fargo on 1st deed of trust. Debtor will make estimated HAMP payment until modification approved or denied. No arrearage claim to be paid through plan. If debtor is granted a loan modification, arrears will be dealt with through modification. If debtor is denied modification, or 6 months elapses from date of filing with no modification, property will be surrendered."

### B. HAMP

The proposal to make "HAMP" payments that White included in her Chapter 13 plan was a reference to the Home Affordable Mortgage Program. Because HAMP became the centerpiece of White's subsequent lawsuit against Wells Fargo, we briefly summarize its function and requirements.

Pursuant to the Troubled Asset Relief Program (TARP), the United States Treasury Department implemented a plan to minimize home foreclosures. (*Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915, 922-933 (*Bushell*).) "That plan was HAMP, introduced in February 2009, and funded by a $50 billion set-aside of TARP monies to induce lenders to refinance mortgages to reduce monthly payments for struggling homeowners. [Citation.]" (*Ibid*.)

Under HAMP, "qualifying homeowners may obtain permanent loan modifications that reduce their mortgage payments. Lenders receive various incentives from the

2

government for each HAMP modification. [Citation.] The participating lender initially determines whether a borrower satisfies certain threshold requirements regarding the amount of the loan balance, monthly payment, and owner occupancy. [Citation.] It then implements the HAMP modification process in two stages. [Citation.] In the first stage, it provides the borrower with a 'Trial Period Plan' (TPP), setting forth the trial payment terms, instructs the borrower to sign and return the TPP and other documents, and requests the first trial payment. [Citation.] In the second stage, if the borrower has made all required trial payments and complied with all of the TPP's other terms, and if the borrower's representations on which the modification is based remain correct, the lender must offer the borrower a permanent loan modification. [Citations.]" (*Rufini v. CitiMortgage, Inc*. (2014) 227 Cal.App.4th 299, 305-306, italics omitted (*Rufini*).)

Several courts have found that a borrower who has been provided with a HAMP TTP may sue the lender under state contract law for failing or refusing to offer a permanent loan modification. (See, e.g., *Rufini*, *supra*, 227 Cal.App.4th at pp. 305-306; *Bushell*, *supra*, 220 Cal.App.4th at pp. 922–923; *West v. JPMorgan Chase Bank, N.A*. (2013) 214 Cal.App.4th 780, 786-788; *Wigod v. Wells Fargo Bank, N.A*. (7th Cir. 2012) 673 F.3d 547, 556-557.)

## C. White's Pleadings

In September 2012, White filed a complaint against Wells Fargo seeking damages and equitable relief, including a judicial declaration that White's loan had been modified to reduce permanently her monthly payments to $1,570. The bare-bones complaint alluded to two legal theories: (1) White was the beneficiary of a class action settlement pursuant to which Wells Fargo agreed to permanently reduce her loan payments; and (2) Wells Fargo breached an "implied agreement" to modify the loan.

In March 2013, White filed a first amended complaint (FAC) instead of opposing Wells Fargo's demurrer. White attempted to allege causes of action for "breach of contract/promissory estoppel" and violations of Business and Professions Code section 17200 et seq. (the UCL), based on two potential contract theories. First, White alleged that her Chapter 13 bankruptcy plan constituted an enforceable contract to

3

permanently modify her mortgage loan by reducing her monthly payment obligations to $1,570. White's second theory was that HAMP required Wells Fargo to modify her loan permanently because White qualified for HAMP relief and Wells Fargo accepted public tax dollars under TARP.

Wells Fargo filed a demurrer to the FAC and a hearing was set for August 6, 2013. The trial court published a tentative ruling sustaining the demurrer which White did not contest. In a detailed order, the trial court outlined deficiencies in the FAC and granted White the opportunity to amend.

On August 26, 2013, White filed her second amended complaint (SAC). Although the SAC is not a model pleading, we discern from it the following factual allegations about White's loan: Since November 2010, White has made monthly mortgage payments in the amount of $1,570 pursuant to a provision in her confirmed Chapter 13 bankruptcy plan which White attached to her SAC. White used HAMP guidelines to calculate this monthly payment. Wells Fargo did not object to White's Chapter 13 plan, dispute her HAMP calculation, or reject any of her loan payments. Incorporating these factual allegations, White attempted to allege causes of action for (1) breach of contract; (2) promissory estoppel; and (3) UCL violations.

The contract theory alleged in the SAC was that Wells Fargo breached a HAMP agreement to reduce White's monthly loan payments to $1570. White alleged that Wells Fargo was required to offer her a HAMP TTP because (1) she qualified for a mortgage payment reduction under applicable HAMP guidelines and (2) Wells Fargo agreed to offer its qualified borrowers a HAMP TTP by accepting TARP money. White further alleged that she satisfied her obligations under the TTP by making reduced monthly payments for the trial period and, therefore, HAMP required that Wells Fargo permanently modify her loan.

In her second cause of action for promissory estoppel, White alleged that Wells Fargo's actions constituted a "clear, definite and certain" promise that if White made reduced payments during the trial period she would receive a permanent loan modification. White also alleged that she detrimentally relied on Wells Fargo's promises

4

by foregoing other remedies to save her home. Finally, in her third cause of action, White alleged in summary fashion that Wells Fargo's acts as alleged in the SAC constitute unlawful, unfair and/or fraudulent business practices under the UCL.

## C. The Demurrer Ruling

Wells Fargo filed a demurrer to the SAC, a hearing was set for October 18, 2013, and again White did not contest a published tentative ruling. Thus, on October 18, the trial court issued a written order sustaining Wells Fargo's demurrer to the SAC without leave to amend (the October 18 order). In its October 18 order, the court found that it had sustained demurrers to substantially similar causes of action in the FAC, and that White failed to remedy the numerous deficiencies that were outlined in the prior order. Nevertheless, the court provided another detailed explanation of material deficiencies in each of White's causes of action.

Notably, the court found that the first cause of action for breach of contract failed to allege facts that would establish the existence of a contract to modify White's loan. White did not attach a written agreement to the SAC, allege facts setting forth the terms of a loan modification agreement, or even allege that there was an offer and acceptance of terms that were definite and enforceable. In this regard, the court found that the Chapter 13 plan that White attached to her SAC was not a contract. The trial court also found that White did not allege facts which would establish that she entered into a loan modification agreement pursuant to HAMP. Nor did she allege facts to overcome the statute of frauds.

The trial court further explained that the second and third causes of action suffered many of the same deficiencies as the first. In addition, the second cause of action for promissory estoppel was not supported by factual allegations which would establish the elements of a definite promise and detrimental reliance. Further, White's UCL claim failed to specify what unlawful, unfair or deceptive act by Wells Fargo caused her an "injury in fact"—a major deficiency highlighted in the order sustaining Wells Fargo's demurrer to the FAC.

5

# III.

# DISCUSSION

## A. Standard of Review

"We review an order sustaining a demurrer de novo to determine whether the complaint states facts sufficient to constitute a cause of action. [Citations.] We construe the complaint 'liberally . . . with a view to substantial justice between the parties' [citation] and treat it ' " 'as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." ' [Citations.]" (*Rufini*, *supra*, 227 Cal.App.4th at pp. 303-304.)

"When the court sustains a demurrer without leave to amend, ' "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." [Citations.]' [Citation.] Whether the plaintiff will ultimately be able to prove the complaint's allegations is not relevant. [Citation.]" (*Rufini*, *supra*, 227 Cal.App.4th at p. 304.)

## B. Issues on Appeal

In her Appellant's Opening Brief (AOB), White's primary argument is that the judgment rests on an erroneous interpretation of HAMP. Taking the position that HAMP confers a legally enforceable right to a loan modification, White posits that allegations in the SAC which state that she and Wells Fargo were both HAMP participants are sufficient to establish that she and Wells Fargo entered into a loan modification agreement. Under White's interpretation of HAMP, neither a written offer nor a signed agreement is required to find a legally enforceable loan modification contract.

In her AOB, White also suggests that the trial court misconstrued the SAC to the extent it concluded that the Chapter 13 plan did not constitute a written agreement. According to the AOB: "The Court pointed out the only writing was the BK Chapter 13

6

plan. However, Appellant doesn't rely only on the Chapter 13 plan. The allegations above that she was accepted into HAMP, paid HAMP payments and never received a permanent modification is sufficient. The Chapter 13 plan statement only supplements these allegations."

In her Appellant's Reply Brief (ARB), White abandons the material arguments advanced in her AOB. She concedes that her "claims do not fit neatly into established caselaw [*sic*]," that she was "not technically given a Trial Payment Plan" under HAMP, and that "she does not have a private right of action under HAMP." Thus, White concludes, "[t]o the extent that Appellant alleges that Respondent was obligated to do anything 'under HAMP,' Appellant withdraws such allegations."

Despite her concessions, White insists that she has or can state a cause of action against Wells Fargo for refusing to modify her loan permanently. Reasoning that a HAMP TTP is not the only path to a permanent loan modification, White argues that her SAC alleges facts which support a different cognizable theory for establishing an enforceable contract to modify her loan permanently. White's alternative theory is that her Chapter 13 plan "was a valid contract" and that the conduct of the parties during the six-month period following the execution of that so-called trial plan agreement, or TPP, constituted "an implied-in-fact contract to permanently modify Appellant's loan."

"Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument." (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453; see also Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2014) ¶ 9:78, pp. 9-26-9-27 [and cases discussed therein].) Here, White's belated argument that her Chapter 13 plan created a contract between her and Wells Fargo is procedurally and factually improper because, as discussed above, she made an express representation in her AOB that her Chapter 13 plan was not an agreement. Despite that representation, however, Wells Fargo addressed White's Chapter 13 contract theory in its Respondent's Brief. Furthermore, after the ARB was filed, Wells Fargo filed a letter

7

providing this court with additional authority pertinent to White's Chapter 13 contract theory and it also addressed that theory during oral argument before this court.

Under these circumstances, we will not address the arguments in White's AOB because they have been waived, but we will consider the arguments in White's ARB.

**C. Analysis**

White contends that if all her pleading allegations pertaining to HAMP are excised from the SAC, the remaining allegations regarding the implementation of White's Chapter 13 bankruptcy plan are sufficient to support the causes of action in the SAC.

### 1. Breach of Contract

"To allege a cause of action for breach of contract, a plaintiff must allege, '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.' [Citation.]" (*Bushell*, *supra*, 220 Cal.App.4th at p. 921.) Here, the SAC does not allege facts to establish the first element of a breach of contract claim under White's newly resurrected Chapter 13 contract theory.

"A Chapter 13 reorganization plan is a contract between the debtor and creditors." (*In re Richardson* (Bankr. S.D. Cal. 1996) 192 B.R. 224, 228.) However, the terms of White's confirmed plan, a document incorporated by reference into the SAC, undermine her new theory that the plan itself constituted a contract to temporarily or permanently reduce her monthly payment obligation to $1,570 per month. In that plan, White unequivocally promised that she would make monthly mortgage payments in the amount of $2,400. The plan does not make any reference to a monthly payment of $1,570.

In her Chapter 13 plan, White also floated a proposal to make "estimated HAMP" payments in some unspecified amount while seeking a loan modification, representing that if she did not obtain a modification within six months, she would surrender her property. This proposal did not impose any obligation on Wells Fargo, nor did it document any promise allegedly made by Wells Fargo.

White contends that the allegation in her SAC that Wells Fargo did not object to her Chapter 13 plan is sufficient to establish acceptance of its terms. However, White herself ignores the unambiguous term in that plan which obligated her to make monthly

payments to Wells Fargo in the amount of $2,400. Perhaps because her own pleading allegations establish that she breached this express obligation, White misconstrues the proposal in her bankruptcy plan as a contract term obligating Wells Fargo to accept monthly loan payments in the amount of $1,570. This interpretation is not only manifestly unreasonable, it would create an irreconcilable conflict with an express term of the confirmed bankruptcy plan. White cannot carry her burden of alleging facts to establish the existence of a loan modification contract by exploiting an ambiguity that she created in her own bankruptcy plan. (See *In re Fawcett* (11th Cir. 1985) 758 F.2d 588, 591 ["the debtor as draftsman of the plan has to pay the price if there is any ambiguity about the meaning of the terms of the plan"].)[2]

White contends that if the Chapter 13 plan was not itself an agreement, it is evidence of an implied-in-fact contract for a loan modification. "An express contract is one, the terms of which are stated in words." (Civ. Code, § 1620.) "An implied contract is one, the existence and terms of which are manifested by conduct." (Civ. Code, § 1621.) " 'The distinction between express and implied in fact contracts relates only to the manifestation of assent; both types are based upon the expressed or apparent intention of the parties. "The true implied contract, then, consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words." [Citations.]' [Citation.]" (*Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 888.)

Here, White argues the parties manifested their mutual assent to a trial period plan that was analogous to a HAMP TTP, i.e., an agreement requiring Wells Fargo to permanently modify the loan if White made the reduced payments proposed in her Chapter 13 plan for six months. She further contends that she has already pleaded

---

[2] Arguably, the proposal in White's Chapter 13 plan was indicative of a future intent to modify the term of the confirmed plan requiring White to make monthly payments to Wells Fargo in the amount of $2,400. However, White did not allege that that she initiated a proceeding in the bankruptcy court to obtain a modification of her confirmed Chapter 13 plan. (See 11 U.S.C. § 1329.)

sufficient facts to establish an implied in fact TTP by alleging that Wells Fargo (1) did not object to her bankruptcy plan, (2) did not explicitly refuse to grant her a loan modification, and (3) accepted loan payments which she expressly characterized as "HAMP" payments. In making this argument, White posits that it is generally understood that "HAMP" means a loan modification program in the same sense that "Band-Aid" means a bandage. Thus, by accepting White's proffered "HAMP" payments, Wells Fargo allegedly manifested its agreement to place White in a modification program pursuant to the proposal in her Chapter 13 plan.

The first and most obvious problem with White's implied contract theory is that the contract she seeks to imply is inconsistent with the bankruptcy plan upon which she relies. That plan states that White will make monthly mortgage payments in the amount of $2,400. However, White has repeatedly acknowledged that she did not make those payments. Instead, since November 2010—before the Chapter 13 plan was even proposed—White unilaterally began making payments in the amount of $1,570 a month. That the SAC characterizes these payments as the estimated HAMP payments referenced in the Chapter 13 plan is beside the point. The factual allegations show that these payments were not made pursuant to an alleged agreement with Wells Fargo, but pursuant to some decision White made on her own in November 2010 and subsequently incorporated into her proposal in the May 2011 Chapter 13 plan.

Another crucial problem with White's implied contract theory is that there is no consideration for an implied promise to give White a hybrid TPP. Regardless how White characterizes the reduced loan payments that she has allegedly made since November 2010, Wells Fargo's acceptance of those payments cannot constitute consideration for a loan modification agreement because White was already obligated to make even greater payments under her note and deed of trust. "A statutory or legal obligation to perform an act may not constitute consideration for a contract. [Citation.]" (*O'Byrne v. Santa Monica-UCLA Medical Center* (2001) 94 Cal.App.4th 797, 808; see also *Grant v. Aerodraulics Co.* (1949) 91 Cal.App.2d 68, 75 [" 'It is an uniform rule of law that a consideration for an agreement is not adequate when it is a mere promise to perform that

10

which the promisor is already legally bound to do.' [Citation.]"]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 218, p. 251 ["doing or promising to do what one is already legally bound to do cannot be consideration for a promise"].)

White contends that her reduced loan payments are consideration for the implied contract because Wells Fargo was not otherwise entitled to receive monthly loan payments from White. According to this theory, once Wells Fargo filed a notice of default, White "was no longer obligated to make monthly payments on her loan" in any amount because, at that point, the only way to cure the default was for her to pay "the entirety of her arrearages." White's premise, which is unsupported by legal authority, does not support her conclusion. A debtor's payment of some amount less than what she is contractually obligated to pay (i.e., her breach) cannot be consideration for a modification of that contract. Put another way, a debtor's default does not erase contractual obligations assumed in a promissory note and deed of trust. This is particularly true when, as here, those contracts provide that if the debtor defaults, the lender does not waive rights that it elects not to assert at the time of the default.

Alternatively, White contends that once she filed for bankruptcy, Wells Fargo lost its right to any future loan payments because at that point White acquired the right to "surrender" her property. According to this theory, White could have avoided having to make any further loan payments by surrendering her property in bankruptcy, but she gave up that right by promising to make six months of estimated HAMP payments. Thus, White posits that by agreeing to the proposal in the Chapter 13 plan, Wells Fargo acquired the right to receive reduced loan payments "to which it would not have otherwise been entitled." Again, White fails to support her assumptions or conclusion with pertinent authority. Furthermore, White has never alleged that she was prevented from surrendering her property. Indeed, the SAC allegations establish that the surrender of White's property was not a right that White secured by filing bankruptcy, but a potential consequence of her own breach of the underlying loan agreement, a consequence she has so far avoided by filing for bankruptcy and then by pursuing this lawsuit.

11

A third independent problem with White's implied contract theory is that it violates the statute of frauds. Contrary to White's unsupported contention on appeal, a mortgage loan modification agreement is subject to the statute of frauds and must therefore be evidenced by a writing. "An agreement for the sale of real property or an interest in real property comes within the statute of frauds. [Citation.] A mortgage or deed of trust also comes within the statute of frauds." (*Secrest v. Security National Mortgage Loan Trust 2002-2* (2008) 167 Cal.App.4th 544, 552.) And "[a]n agreement to modify a contract that is subject to the statute of frauds is also subject to the statute of frauds. [Citations.]" (*Id.* at p. 553; see also *Dooms v. Federal Home Loan Mortgage Corp.* (E.D. Cal. 2011) 2011 U.S. Dist. LEXIS 38550 at *17 [" 'an alleged offer for a loan modification is subject to the statute of frauds since it seeks to modify a deed of trust, which is subject to the statute of frauds' "].)

Finally, White contends the trial court abused its discretion by rejecting her request to amend the SAC to clarify the circumstances surrounding the Chapter 13 "agreement." Specifically, White argues that she can "establish" her implied contract claim by amending her pleading to allege that Wells Fargo initially objected to her Chapter 13 plan but subsequently withdrew that objection and, at around the time of the withdrawal of that objection and the confirmation of the plan, White's bankruptcy attorney told her that "Wells Fargo had agreed that the said $1,570 payments were going to be received by Wells Fargo as trial plan payments under the HAMP Program."

White argues that this proposed amendment will clarify "that there was a meeting of the minds with respect to what the $1,570.00 payments constituted, how they were to be viewed, and what two scenarios could result after six months." This proposed amendment appears to introduce the possibility of an oral promise to provide White with a hybrid TPP which (1) violated the statute of frauds; and (2) was not supported by consideration. In other words, this new theory suffers from the same deficiencies as the theories White alleged in three prior versions of her complaint. Thus, White has failed to establish that the trial court abused its discretion by denying her leave to amend her breach of contract cause of action.

## 2. *Promissory Estoppel*

" 'Promissory estoppel is "a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced." [Citation.]' [Citation.] Because promissory estoppel is an equitable doctrine to allow enforcement of a promise that would otherwise be unenforceable, courts are given wide discretion in its application. [Citations.]" (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 901-902.) The doctrine binds a promisor " 'when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement.' [Citation.] ' "The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted." ' [Citation.] ' "In such a case, although no consideration or benefit accrues to the person making the promise, he is the author or promoter of the very condition of affairs which stands in his way; and when this plainly appears, it is most equitable that the court should say that they shall so stand. [Citations.]" ' [Citation.]" (*Garcia v. World Savings, FSB* (2010) 183 Cal.App.4th 1031, 1041.)

White contends that "when taken as a whole, the allegations in her SAC state sufficient facts to constitute a cause of action for Promissory Estoppel, even if she is not ultimately able to prove the breach of a proper contract . . . ." We disagree.

"The elements of promissory estoppel are (1) a clear and unambiguous promise by the promisor, and (2) reasonable, foreseeable and detrimental reliance by the promisee. [Citation.]" (*Bushell*, *supra*, 220 Cal.App.4th at p. 929.) The SAC does not contain any allegations of fact that would establish Wells Fargo made a clear and unambiguous promise to give White a hybrid TPP, or a permanent loan modification. The bare allegation that Wells Fargo made "clear, definite and certain promises" is not a properly pleaded material fact but simply a legal conclusion which we disregard on appeal. (*Rufini*, *supra*, 227 Cal.App.4th at pp. 303-304.) Similarly, SAC allegations to the effect that White reasonably and detrimentally relied on some unspecified promise by making

13

TPP payments instead of pursuing other opportunities to cure her default are conclusory contentions, not allegations of fact.

White mistakenly relies on *Aceves v. U.S. Bank N.A.* (2011) 192 Cal.App.4th 218 (*Aceves*). In that case, the plaintiff homeowner filed for Chapter 7 bankruptcy because she could not afford to make her mortgage payments. When she contacted her lender, U.S. Bank, plaintiff was told "that, once her loan was out of bankruptcy, the bank 'would work with her on a mortgage reinstatement and loan modification.' " (*Id.* at p. 223.) The plaintiff intended to convert her case to a Chapter 13 proceeding and, with financial assistance from her husband, cure her default and reinstate her loan. (*Id*. at pp. 221, 223.) However, U.S. Bank filed a motion to lift the bankruptcy stay. Then, the bank's agent requested permission from plaintiff's counsel to contact plaintiff directly in order to " 'explore Loss Mitigation possibilities.' " In response, plaintiff contacted the agent and was told that nobody could speak to her until the automatic stay was lifted. (*Id*. at p. 223.) Relying on U.S Bank's promise to work with her to reinstate and modify her loan, plaintiff did not convert her case to a Chapter 13 proceeding or oppose the motion to lift the bankruptcy stay. Ultimately, U.S. Bank foreclosed on plaintiff's property. (*Id*. at pp. 223-224.)

The *Aceves* court found that the plaintiff stated a cause of action for promissory estoppel by alleging the facts summarized above. (*Aceves*, *supra*, 198 Cal.App.4th at p. 226.) U.S. Bank's agreement to " 'work with' " the plaintiff " 'on a mortgage reinstatement and loan modification' if she no longer pursued relief in the bankruptcy court" was "a clear and unambiguous promise." (*Ibid*.) Furthermore, the plaintiff reasonably and foreseeably relied on U.S. Bank's promise, because the opportunity to work with the bank to modify and reinstate the loan was relief that would not have been available if plaintiff had converted her case to a Chapter 13 proceeding. As the court explained, a "bankruptcy court could have reinstated the loan—permitted Aceves to cure the default, pay the arrearages, and resume regular loan payments—but it could not have modified the terms of the loan, for example, by reducing the amount of the regular monthly payments or extending the life of the loan. [Citations.]" (*Id*. at p. 227, italics

14

omitted.) Thus, the court concluded that "[b]y promising to work with Aceves to modify the loan in addition to reinstating it, U.S. Bank presented Aceves with a compelling reason to opt for negotiations with the bank instead of seeking bankruptcy relief. [Citation.]" (*Id*. at p. 228, italics omitted.)

White contends that the "similarities between *Aceves* and the instant action are striking." We disagree. The *Aceves* plaintiff alleged that her bank made an explicit representation that it would work with her to modify and reinstate her loan. Here by contrast, White failed to allege facts that would establish a clear promise; she appears to argue that Wells Fargo's promise can be inferred from a proposal that she herself made. As noted earlier, White unilaterally decided to reduce her monthly payments to Wells Fargo even before filing her Chapter 13 proceeding. In addition, Wells Fargo did not draft the Chapter 13 plan or make the proposal contained in it. Furthermore, although it accepted reduced payments, the underlying debt existed independently of anything White said or did in connection with her bankruptcy case. Just as White cannot unilaterally create a loan modification contract, she cannot use her own proposal to establish that Wells Fargo made a promise to modify her loan.

Furthermore, in stark contrast to the *Aceves* plaintiff, White did not allege any facts to show detrimental or foreseeable reliance. Even if the Chapter 13 proposal could be construed as evidence of some promise by Wells Fargo, that proposal did not state or imply that Wells Fargo would give White a permanent loan if she made six months of reduced loan payments. Indeed, we find no facts in the SAC, the appellate record or the parties' briefs which could conceivably support a finding that White reasonably or foreseeably construed Wells Fargo's acceptance of reduced payments she made pursuant to her Chapter 13 plan proposal as a promise to modify her loan permanently.

White contends that if Wells Fargo had accepted only six months of payments as proposed in the Chapter 13 plan, but then rejected the seventh, "then Appellant would likely have no claims against Respondent." However, she argues, because the bank "continued to accept those payments for three and a half years," she has pleaded facts to establish detrimental reliance and resultant damages. This theme, which runs throughout

15

White's appeal, misconstrues the few facts that White alleged or incorporated into her SAC. As noted, White alleged that she began making reduced loan payments in November 2010, long before she submitted her Chapter 13 plan. Second, the Chapter 13 plan proposed that White would make reduced loan payments while she sought a loan modification and that if she did not receive such a modification in six months time, *she* would surrender her property. Nowhere did White allege that she withheld surrendering the property because of anything Wells Fargo said, nor did she allege or even suggest that she was prevented from surrendering her property while, on her own initiative, she continued to send reduced monthly payments to Wells Fargo.

Finally, White's theory of reliance rests on the illogical premise that the reasonableness of her expectation of a loan modification directly correlates to the number of reduced loan payments that Wells Fargo accepts. If anything, the opposite is true. At least by the time White filed this lawsuit she had to know that Wells Fargo did not intend to permanently modify her monthly payment obligations.

### 3. *The UCL*

"The purpose of the UCL 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. [Citation.]' [Citations.] The UCL 'defines "unfair competition" to mean and include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law ([Bus. & Prof. Code,] § 17500 et seq.)]." [Citation.]' [Citation.] Whether a plaintiff has standing to sue under the UCL and whether an alleged business practice violated the UCL both may be resolved at the demurrer stage in appropriate cases. [Citations.]" (*Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 252 (*Drum*).)

"[A] private person has standing to sue under the UCL only if that person has suffered injury and lost money or property 'as a result of such unfair competition.' [Citation.]" (*Daro v. Superior Court* (2007) 151 Cal.App.4th 1079, 1098, italics omitted (*Daro*).) Thus, in order to state a claim under the UCL White must plead facts which "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in

16

fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322 (*Kwikset*); see also *Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 521-522 (*Jenkins*).)

White claims that she has UCL standing because Wells Fargo caused her to make close to four years of estimated HAMP payments that Wells Fargo was not otherwise entitled to receive. However, the reduced loan payments that White unilaterally had been making since November 2010 do not qualify as an economic injury because, as discussed above, White was legally obligated to make payments of even more than that amount under the terms of her loan. Furthermore, White has not alleged or suggested facts to show that she made the reduced loan payments as a result of some unlawful business act on the part of Wells Fargo. In this regard, the SAC allegations establish the following facts: In November 2010, White made a unilateral decision to start making a reduced loan payment; in April 2011, White submitted a bankruptcy plan in which she proposed to make estimated HAMP payments for six months while she pursued a loan modification; the six-month period proposed in the Chapter 13 plan came and went but Wells Fargo did not permanently modify the loan.

These pleaded facts show that White made unilateral decisions to reduce her monthly loan payments and to continue to make that reduced monthly loan payment for several years notwithstanding the fact that Wells Fargo never offered to modify her loan, either temporarily or permanently. In other words, White has not identified any allegedly unfair, unlawful or fraudulent business practice by Wells Fargo which caused her to sustain an injury in fact. By the same token, she has not alleged facts that would establish a substantive violation under any prong of the UCL.

"The UCL's unlawful prong ' " 'borrows' violations of other laws and treats them as unlawful practices" that the unfair competition law makes independently actionable. [Citation.]' [Citation.]" (*Jenkins*, *supra*, 216 Cal.App.4th 497 at p. 520.) Furthermore, even if a business practice is not unlawful, it may violate the UCL if it is deemed "unfair" as that term has been defined by the pertinent case law. (See *Cel-Tech Communications*

17

*v. Los Angeles Cellular Telephone Co*. (1999) 20 Cal.4th 163.)  And, a business practice is fraudulent within the meaning of the UCL if it is likely to deceive or mislead the consumer.  (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 312; *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 252-253.)

In the present case, the SAC cause of action for violations of the UCL is supported by three allegations.  First, White incorporates prior allegations by reference; second she alleges on information and belief that Wells Fargo's acts constitute an unlawful, unfair and/or fraudulent business practice; and third she alleges that Wells Fargo's unspecified acts caused her unspecified damage and injury.  These allegations provide no factual basis for establishing a UCL violation.

On appeal, White makes the tautological assertion that her conclusory allegations are sufficient to withstand a demurrer because all UCL claims depend on the resolution of issues of fact.  First, we agree that an UCL claim can be fact intensive which is why the failure here to allege concrete facts identifying the alleged violation is such a glaring deficiency.  Second, to withstand a demurrer, a pleading must allege material facts that establish the elements of the claim.  On appeal, we consider only material allegations of fact, not conclusions of fact or law.  (*Young v. Gannon* (2002) 97 Cal.App.4th 209, 220.)  The SAC simply does not contains material factual allegations sufficient to state a UCL cause of action.

## IV.
## DISPOSITION

The judgment is affirmed.

18

_____

RUVOLO, P. J.

We concur:


_____

RIVERA, J.


_____

STREETER, J.