Filed 7/28/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| NICHOLAS CONROY et al., | |
| Plaintiffs and Appellants, | C078914 |
| v. | (Super. Ct. No. PC20130417) |
| WELLS FARGO BANK, N.A. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of El Dorado County, Warren C. Stracener, Judge. Affirmed.

UNITED LAW CENTER and Danny A. Barak for Plaintiffs and Appellants.

NATIONAL HOUSING LAW PROJECT and Kent Qian; LAW OFFICES OF ELIZABETH S. LETCHER and Elizabeth S. Letcher; LAW OFFICE OF ERIC ANDREW MERCER and Eric Andrew Mercer for National Housing Law Project, California Reinvestment Coalition, Housing and Economic Rights Advocates, Law Foundation of Silicon Valley, Legal Services of Northern California, Neighborhood Legal Services of Los Angeles County, Public Good Law Center and Eric Andrew Mercer; Kamala D. Harris, Attorney General, Nicklas A. Akers, Assistant Attorney General, Michele Van Gelderen and Alica K. Hancock, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Appellants.

SEVERSON & WERSON and Jan T. Chilton for Defendants and Respondents.

In 2005, Nicholas and Mary Conroy refinanced their residence with a mortgage loan that was secured by a deed of trust on the property. Five years later, the Conroys stopped making payments and defaulted on their loan. In an effort to avoid foreclosure, the Conroys filed suit against defendants Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.; Fidelity National Title Insurance Company aka Default Resolution Network, LLC; and HSBC Bank USA, N.A. as trustee for Merrill Lynch Mortgage Backed Securities Trust, Series 2007-2 (Wells Fargo). The Conroys' first amended complaint alleged causes of action for intentional misrepresentation, negligent misrepresentation, negligence, violation of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.), equitable accounting, promissory estoppel, violations of Civil Code sections 2923.6 and 2923.7,[1] and for declaratory relief. The trial court sustained Wells Fargo's demurrer without leave to amend and entered a judgment of dismissal.

On appeal, the Conroys contend the trial court erroneously dismissed their causes of action for (1) intentional and negligent misrepresentation by ignoring their allegations Wells Fargo made several material representations about refinancing while Wells Fargo never intended to modify the loan, (2) negligence by mistakenly concluding Wells Fargo did not owe a duty of care to the Conroys, (3) promissory estoppel by ignoring allegations Wells Fargo deliberately miscalculated the Conroys' income as a pretext for denial of loan modification, (4) violations of section 2923.6 by concluding the statute does not apply to the Conroys' request for a loan modification after the effective date of the statute, (5) violation of section 2923.7 by construing the statute to require a borrower to affirmatively request a single point of contact with the loan servicer, and (6) under the

---

[1] Undesignated statutory references are to the Civil Code.

UCL by concluding this claim was merely derivative of other claims, all of which were dismissed. The Conroys abandon their causes of action for equitable accounting and declaratory relief.

In addition to the parties' briefs, we have received and considered an amicus curiae brief from the Attorney General and another from the National Housing Law Project, California Reinvestment Coalition, Housing and Economic Rights Advocates, Law Foundation of Silicon Valley, Legal Services of Northern California, Neighborhood Legal Services of Los Angeles County, Public Good Law Center, and Eric Andrew Mercer (collectively the National Housing Law Project).

We conclude the Conroys' operative complaint does not state valid causes of action for intentional or negligent misrepresentation because they did not properly plead actual reliance or damages proximately caused by Wells Fargo. The trial court properly determined the Conroys could not assert a *tort* claim for negligence arising out of a *contract* with Well Fargo. For lack of detrimental reliance on any of Wells Fargo's alleged promises, the Conroys did not set forth a viable cause of action for promissory estoppel even under a liberal construction of the operative complaint.

The Conroys' claim under section 2923.6 is not viable because subdivision (g) of that statute excludes loan modification applications undertaken before January 2, 2013. Because Wells Fargo considered and rejected a loan modification for the Conroys before that date, section 2923.6 does not apply to them. The plain language of section 2923.7 requires a borrower to expressly request a single point of contact with the loan servicer. The Conroys' operative complaint did not allege they ever requested a single point of contact. And the Conroys do not state they can amend their cause of action to allege they actually requested a single point of contact. The trial court properly dismissed the Conroys' UCL claim because it is merely derivative of other causes of action that were properly dismissed.

3

Accordingly, we affirm the trial court's judgment of dismissal.

STANDARD OF REVIEW

In reviewing a trial court's order sustaining a demurrer without leave to amend, we apply the de novo standard of review to exercise our independent judgment regarding whether the operative complaint states valid causes of action as a matter of law. (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 300.) For purposes of review, we assume the truth of properly pleaded factual allegations in the operative complaint and give the complaint a reasonable interpretation by reading it as a whole and all its parts in their context. (*Ibid.*) "We do not assume the truth of contentions, deductions, or conclusions of fact or law, and may disregard allegations that are contrary to the law or to a fact that may be judicially noticed." (*Fischer v. Time Warner Cable Inc*. (2015) 234 Cal.App.4th 784, 790.) And we may accept factual allegations made by plaintiffs in "an affidavit filed voluntarily in opposition to the defendant's demurrer" when the affidavit contradicts the plaintiffs' pleadings. (*Able v. Van Der Zee* (1967) 256 Cal.App.2d 728, 734 (*Able*); see also *C.R. v. Tenet Healthcare Corp*. (2009) 169 Cal.App.4th 1094, 1103 [on demurrer, sworn statements "may be accepted when made by a party but not those of third parties or an opponent"]; *Rauber v. Herman* (1991) 229 Cal.App.3d 942, 953, fn. 3 [on demurrer sustained without leave to amend, taking judicial notice of plaintiff's declarations filed in support of their request for preliminary injunction].)

We review the trial court's denial of leave to amend for abuse of discretion. (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 44 (*Rakestraw*).) To secure a reversal, plaintiffs must demonstrate a reasonable probability they can amend their complaint to cure any fatal defect. (*Id.* at p. 43.) "To satisfy that burden on appeal, a plaintiff 'must show in what manner he [or she] can amend his [or her] complaint and how that amendment will change the legal effect of his [or her] pleading.' (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.) The assertion of an abstract right to amend does

4

not satisfy this burden. (*McKelvey v. Boeing North American, Inc.* (1999) 74 Cal.App.4th 151, 161.) The plaintiff must clearly and specifically set forth the 'applicable substantive law' (*Community Cause v. Boatwright* (1981) 124 Cal.App.3d 888, 897) and the legal basis for amendment, i.e., the elements of the cause of action and authority for it. Further, the plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action." (*Rakestraw*, at p. 43.)

BACKGROUND

Consistent with the standard of review, we recount the factual background based on the Conroy's first amended complaint (the operative complaint) and declarations filed by the Conroys in support of their request for a preliminary injunction.

### *The Operative Complaint and the Conroys' Declarations*

In 2004, Nicholas and Mary Conroy received a residential property in Cameron Park by quitclaim deed from Mary's mother. In 2005, the Conroys took out a mortgage on the property that was secured by a deed of trust. In 2009, the Conroys' household income decreased significantly and they had difficulty making mortgage payments. The Conroys unsuccessfully attempted to refinance their loan.

In June 2010, Nicholas's employer "was forced to reduce [his] salary dramatically. As a result, [the Conroys'] household income decreased and [they] were forced to either seek a modification with . . . Wells Fargo . . . or face foreclosure on [their] home of nearly 20 years." That month, the Conroys contacted Wells Fargo about a loan modification but were informed by a Wells Fargo agent that they were required to miss three mortgage payments before the modification process could begin. "Unsure as to whether this was sound advice, [the Conroys] continued to make mortgage payments through . . . about September 2010. At that time, [the Conroys] simply could not proceed without a modification so they heeded the aforementioned agent's advice and ceased

5

making mortgage payments beginning in or about October 2010." The Conroys made no further loan payments but continued to live in the house.

The Conroys would unsuccessfully apply six times for a loan modification with Wells Fargo, which serviced the loan on behalf of Fidelity National Title Insurance Company (the loan's trustee) and HSBC Bank USA, N.A. as trustee for Merrill Lynch Mortgage Backed Securities Trust, Series 2007-2 (the loan's beneficiary).

The first loan modification process began in November 2010 when Wells Fargo notified the Conroys they might be eligible for a Federal Housing Administration Home Affordable Modification Program (HAMP) loan modification. In December 2010, Wells Fargo informed the Conroys they were required to sign a Dodd-Frank certification. Although the Conroys assert they were not required to sign the certification, they did so within a week. In January 2011, Wells Fargo denied the loan modification application on grounds that not all required documents had been submitted by the Conroys. The Conroys allege they submitted all required documents to Wells Fargo. That same month, Wells Fargo notified the Conroys it was beginning foreclosure proceedings.

The Conroys submitted a second loan modification application in February 2011 that Wells Fargo denied on grounds of inadequate income.

In March 2011, Wells Fargo contacted the Conroys and stated they might be eligible for a loan modification. A third loan modification application was submitted by the Conroys in April 2011. In June 2011, Wells Fargo denied the application for lack of adequate income. The Conroys assert the application was erroneously denied because Wells Fargo should have considered business travel reimbursements by Nicholas's employer and his "modest" income from his "small side business" as an independent contractor. Also in June, a notice of default was recorded on the Conroys' deed of trust.

In July 2011, the Conroys declared bankruptcy.

6

In August 2011, Wells Fargo denied a fourth application for loan modification on grounds it was unable to reach the Conroys to verify information with them. The Conroys assert they were available to respond to Wells Fargo.

A notice of trustee's sale was recorded in November 2011. Also in November, the Conroys' bankruptcy action became final, and they submitted a fifth loan modification application to Wells Fargo. This application was denied in February 2012, on grounds of inadequate gross monthly income. The Conroys disputed the income calculation and urged Wells Fargo to consider Nicholas's travel reimbursements and income from his side business as an independent contractor.

A sixth loan modification application was submitted by the Conroys in April 2012. During the application process, the Conroys received assistance from the National Association of Consumer Advocates. Over the next several months, Wells Fargo repeatedly asked for additional documentation including profit and loss statements for Nicholas's business.

While the sixth loan modification application process was pending, the California Homeowner Bill of Rights (HBOR) became effective in January 2013. (Stats. 2012, ch. 86, § 13.) In April 2013, Wells Fargo denied the application on grounds the Conroys lacked sufficient monthly income. The Conroys appealed the denial to Wells Fargo, and the appeal was denied in July 2013.

### Causes of Action Asserted Against Wells Fargo

In August 2013, the Conroys filed a complaint asserting causes of action for intentional and negligent misrepresentation, negligence, violation of the UCL, equitable accounting, and promissory estoppel. That same month, the trial court granted the Conroys' application for a temporary restraining order to prevent a trustee's sale of the residence. However, the trial court denied the Conroys' subsequent request for a preliminary injunction along with its tentative decision sustaining Wells Fargo's demurer

7

to the complaint. From this ruling, the Conroys filed a petition for writ of mandate in this court. This court summarily denied the writ petition.

In December 2013, the Conroys filed their first amended complaint that added two causes of action under the HBOR and a claim for declaratory relief. Wells Fargo filed a demurrer and request for judicial notice. The Conroys opposed the demurrer.

### *Defendant's Demurrer Sustained Without Leave to Amend*

The trial court sustained Wells Fargo's demurrer without leave to amend.

As to the intentional and negligent misrepresentation claims, the trial court found the Conroys did not properly allege causation for either cause of action. The trial court found, "There are no factual allegations in the 1st amended complaint that the provision of financial information, incurring additional fees, interest, arrears, attorney fees and costs was due to anything other than plaintiffs' pursuit of a loan modification that they admit in the factual allegations of the operative pleading was the result of their financial circumstances that existed prior to embarking on the loan modification process. There are no facts alleged to establish that their inability to pay their loan payments with the resulting damage to the plaintiffs' credit rating was caused by anything other than their admittedly poor financial condition that rendered them unable to meet their financial obligations. In short, there are no specific facts alleged that establish the defendant lenders and loan servicers placed the plaintiffs in a position creating the need for a loan modification due to the alleged misrepresentations. Plaintiffs have essentially alleged they wanted to pursue the loan modification and all they were told was that they could only be considered for loan modification if they were in default. Plaintiffs admit that they ceased making mortgage payments for well over three years, because of their extreme financial straits and inability to meet their loan obligations due to a downturn in the economy causing a significant decrease in their income."

As to the negligence claim, the trial court determined Wells Fargo did not owe the Conroys a duty of care. The trial court stated, "Accepting modification applications, requesting additional documents and conditions of an applicant, and representing that it was endeavoring to actually review an applicant for a modification, does not give rise to a duty of care to actually review the loan modification application and documents, or to timely determine whether or not to grant a loan modification." As an additional ground for sustaining the demurrer as to the negligence claim, the trial court noted the Conroys admitted they were financially unable to make the payments on the loan.

As to the claim of promissory estoppel, the trial court concluded the Conroys had not stated a claim because "[a] promise to review a loan modification application is not a clear and unambiguous promise to approve the application, or to be error free in handling documentation and/or reviewing that documentation." The trial court also determined the Conroys had not alleged injury by reliance on a promise made by Wells Fargo. The operative complaint and the Conroys' declarations showed they defaulted on the mortgage due to their financial inability to make loan payments and not because of any promise made by Wells Fargo.

As to the cause of action asserted under section 2923.6, the trial court concluded the statute did not apply because "the Legislative intent appears to be to bar the application of Section 2923.6 in instances where the borrower was denied a loan modification prior to the effective date of the [HBOR]; to bar application of the requirements of this Section to applications for loan modifications submitted after the first application was denied; and to prevent lenders from being exposed to operation of this statute in the event of multiple applications for loan modification."

Regarding the cause of action under section 2923.7, the trial court concluded the statute requires a borrower to request a single point of contact before the loan servicer must comply with the statute. On grounds the Conroys' operative complaint did not

9

allege they ever requested a single point of contact, the trial court sustained Wells Fargo's demurrer to this cause of action.

From the judgment of dismissal, the Conroys timely filed a notice of appeal in March 2015. In July 2015, a trustee's deed upon sale was recorded with the El Dorado County recorder.[2]

## DISCUSSION

### I

### *Intentional and Negligent Misrepresentation*

The Conroys contend the trial court erred in sustaining the demurrer to their causes of action for intentional and negligent misrepresentation. They assert the trial court erroneously found they alleged only one instance of material misrepresentation of fact. The Conroys argue they alleged seven instances of misrepresentations when Wells Fargo told them they had to be 90 days delinquent on their loan before a modification could be considered, "refused to process their HAMP application because [they] did not complete a Dodd-Frank certification," and during the subsequent loan modification processes because Wells Fargo intended only to collect late fees from the Conroys. We conclude the trial court properly sustained the demurrer without leave to amend their causes of action for intentional and negligent misrepresentation. Taken together, the Conroys' operative pleading and their declarations in support of their request for a temporary stay establish they did not plead viable claims of actual reliance or damages. We affirm the dismissal of these two causes of action because the Conroys cannot cure the defects as to the elements of actual reliance and damages.

---

[2] The Conroys' request for judicial notice, filed December 10, 2015, is granted as to the trustee's deed upon sale recorded with the El Dorado County Recorder on July 29, 2015. (Evid. Code, §§ 452, subd. (h), 459.) We deny the request for judicial notice as to the other documents regarding the deed of trust because they are unnecessary to the resolution of this appeal.

10

# A.

### *The Elements of Actual Reliance and Damages*

In asserting claims for intentional and negligent misrepresentation, the Conroys were required to plead elements of reliance and damages. "The elements of a cause of action for intentional misrepresentation are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) actual and justifiable reliance, and (5) resulting damage. (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230–231 (*Chapman*).) The elements of a claim for negligent misrepresentation are nearly identical. Only the second element is different, requiring the absence of reasonable grounds for believing the misrepresentation to be true instead of knowledge of its falsity. (*Bock v. Hansen* (2014) 225 Cal.App.4th 215, 231; *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173–174 (*Small*).)

"Causes of action for intentional and negligent misrepresentation sound in fraud and, therefore, each element must be pleaded with specificity. (*Chapman, supra*, 220 Cal.App.4th at p. 231; *Small, supra*, 30 Cal.4th at p. 184.) 'The specificity requirement means a plaintiff must allege facts showing how, when, where, to whom, and by what means the representations were made, and, in the case of a corporate defendant, the plaintiff must allege the names of the persons who made the representations, their authority to speak on behalf of the corporation, to whom they spoke, what they said or wrote, and when the representation was made.' (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 793 (*West*).) However, 'the requirement of specificity is relaxed when the allegations indicate that "the defendant must necessarily possess full information concerning the facts of the controversy" [citations] or "when the facts lie more in the knowledge of the" ' defendant. (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158.) The specificity requirement serves two purposes: 'to apprise the defendant of the specific grounds for the charge and enable the court to

determine whether there is any basis for the cause of action.' (*Chapman, supra*, at p. 231.)" (*Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1166-1167 (*Daniels*).)

**B.**

*Actual Reliance*

The first misrepresentation alleged by the Conroys concerns an assertion made by a Wells Fargo employee who stated in June 2010 that the loan modification process could not begin until the Conroys were more than 90 days delinquent on their loan. The Conroys' operative complaint establishes they did not actually rely on the asserted misrepresentation because they "continued to make mortgage payments through . . . about September 2010." The Conroys pleaded they continued to make mortgage payments as long as they could because they were "[u]nsure as to whether this was sound advice" to allow the loan to become delinquent for more than 90 days. The Conroys eventually stopped making mortgage payments, not in reliance on any statements or conduct by Wells Fargo, but because they could no longer afford the payments. As their operative complaint states, the Conroys "simply could not proceed without a modification . . . ." Thus, the Conroys' complaint refutes their argument they properly pleaded actual reliance as to the first asserted misrepresentation by Wells Fargo.

The second alleged misrepresentation concerned Wells Fargo's insistence it "would not proceed with their modification until [the Conroys] sent [Wells Fargo] a Dodd-Frank Certification, certifying that neither [of the Conroys] had ever been convicted of an enumerated real-estate related felony." The operative complaint further alleges: "Although not technically required to send a Dodd-Frank Certification in order to proceed with the modification, [the Conroys] nevertheless sent the requested document immediately." Even if unnecessary, as the Conroys assert, their immediate submission of a Dodd-Frank certification meant they did not actually rely

12

on the misrepresentation to change their position to their detriment – such as "by discontinuing efforts to pursue a refinance from other financial institutions or to pursue other means of avoiding foreclosure (such as bankruptcy restructuring, or selling or renting their home)." (*Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915, 928 (*Bushell*).)

As to the remaining five misrepresentations, the Conroys' opening brief offers no analysis other than to assert they "all deal with Wells Fargo's denials of [the Conroys'] various loan modification applications over a two and a half year period." Their opening brief thus omits any attempt to identify who made the representations, what was the substance of the misrepresentations, or what they did in actual reliance on these misrepresentations. However, the Conroys bear the burden of describing the misrepresentation's substance, the person making the misrepresentation, and what they did in reliance on the misrepresentation. (*Daniels, supra,* 246 Cal.App.4th at pp. 1166-1167.) And they bear the burden of demonstrating error in the trial court's sustaining of the demurrer. (*Rakestraw, supra,* 81 Cal.App.4th at pp. 43-44; *Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879.) They have not met these burdens.

The trial court properly determined the Conroys did not plead actual reliance on the alleged misrepresentations of Wells Fargo.

## C.

### *Damages*

The trial court also correctly determined the Conroys' operative complaint did not plead the element of damages. In sustaining the demurrer without leave to amend, the trial court found the Conroys "have expressly admitted that the mortgage payments were extremely burdensome due to a significant decrease in income; they unsuccessfully attempted to refinance; they initiated the loan modification process; they could not proceed without a loan modification; and they intentionally stopped making payments.

13

[The Conroys] admit they had to file for bankruptcy protection, because they did not have a loan modification.  In essence, [the Conroys] have depicted in their factual allegations a situation wherein they were financially unable to make their payments when due and their financial inability to meet their loan payment obligations was entirely unrelated to any of the alleged misrepresentations made before and during the loan modification process.  There are no allegations in the complaint that [the Conroys] were at all times ready, willing, and able to continue to make the loan payments throughout the entire period of time that the loan modification process took, but merely withheld such payments in reliance on the alleged misrepresentations."  Thus, the trial court determined the Conroys could not plead damages were "caused by anything other than their admittedly extremely poor financial condition that rendered them unable to meet their financial obligations."

The trial court's findings are supported by the Conroys' declarations in support of their request for a temporary stay of the foreclosure process.  Mary Conroy submitted a declaration stating:  "In or about June 2010, as a result of the downturn in the economy, the business for which my husband works, Skandia Window Furnishings, was forced to reduce his salary dramatically.  As a result, our household income decreased and we were forced to either seek a modification with [Wells Fargo] or face foreclosure on our home of nearly 20 years."  Nicholas Conroy submitted a declaration with an identical statement, except for the use of a first person pronoun to indicate Skandia Window Furnishings was his employer.  These statements by the Conroys may be relied upon in assessing their ability to state causes of action for intentional and negligent misrepresentation.  (*Able, supra,* 256 Cal.App.2d at p. 734.)  The Conroys' declarations conclusively undermine their ability to claim damages were caused by asserted misrepresentations by Wells Fargo.  Instead, the loss of their residence was due to an inability to make their loan payments.

14

Moreover, the nonjudicial foreclosure of their residence extinguished their liability for any costs, penalties, or deficiencies arising out of the delinquency on the loan. (Code Civ. Proc., § 580d, subd. (a) [providing, with exceptions not pertinent here, that "no deficiency shall be owed or collected, and no deficiency judgment shall be rendered for a deficiency on a note secured by a deed of trust or mortgage on real property or an estate for years therein executed in any case in which the real property or estate for years therein has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust"].)

We also reject the Conroys' argument they can state damages based on time and money expended on the modification process. The Conroys' declarations establish they pursued the modification process, not based on Wells Fargo's representations, but based on their financial predicament. Their time and photocopying expenses would have been required in pursuing loan refinancing or modification in any attempt to refinance or modify their loan. On this point, the Conroys' misplace their reliance on *Bushell, supra,* 220 Cal.App.4th 915. Although *Bushell* held that time and effort in preparing a loan modification application constituted detrimental reliance supporting a claim for time and document preparation, that case involved an actual promise by the lender to modify the loan under a trial payment period. (*Id.* at p. 930.) And unlike *Bushell*, the Conroys have not alleged they discontinued efforts with other lenders or surrendered other opportunities to avoid foreclosure. (*Ibid.*)

The Conroys' operative complaint combined with their declarations indicate they did not rely on any of Wells Fargo's alleged promises in pursuing loan modification and their damages were caused by their dire financial condition rather than Wells Fargo's alleged misrepresentations. The Conroys' declarations compel the conclusion they cannot state claims for intentional or negligent misrepresentation.

15

## II

### *Negligence*

The Conroys contend the trial court erred in dismissing their cause of action for negligence on grounds Wells Fargo owed them no duty of care. Similarly, the amicus brief filed by the National Housing Law Project argues in favor of a legal duty of care under the analysis set forth by the California Supreme Court in *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*). We are not persuaded.

### A.

### *The Conroys' Negligence Claim*

We begin by noting our review is limited and focuses only on the specific conduct the Conroys claim Wells Fargo had a duty to undertake. (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 62 (*Lueras*).) The Conroys specify their negligence cause of action is based on claims "that their servicer (1) failed to review their application in a timely manner, (2) mishandled their applications by miscalculating their income and relying on incorrect information, and (3) claiming to have received no documents when the plaintiffs specifically alleged they did send all documents to the servicer." They further assert the trial court "should have taken as true their allegation that 'HAMP guidelines do not require 90 days of delinquency prior to HAMP applications.' "

### B.

### *Legal Duty*

The California Supreme Court has explained, " '[N]egligence is conduct which falls below the standard established by law for the protection of others.' (Rest.2d Torts, § 282.) 'Every one is responsible, not only for the result of his [or her] willful acts, but also for an injury occasioned to another by his [or her] want of ordinary care or skill in the management of his [or her] property or person, except so far as the latter has, willfully

16

or by want of ordinary care, brought the injury upon himself [or herself].'  (§ 1714, subd. (a).)

"The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion.  (Rest.2d Torts, § 281, subd. (a); 6 Witkin, Summary of Cal. Law (9th ed. 1988), Torts, § 732, p. 60.)  Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court.  (6 Witkin, *supra*, § 748 at p. 83.)

"A judicial conclusion that a duty is present or absent is merely ' "a shorthand statement . . . rather than an aid to analysis. . . .  '[D]uty,' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." '  (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734, quoting Prosser, Law of Torts (3d ed.) pp. 332–333.)  'Courts, however, have invoked the concept of duty to limit generally "the otherwise potentially infinite liability which would follow from every negligent act. . . ." '  (*Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 750, quoting *Dillon, supra*, 68 Cal.2d at p. 739.)"  (*Bily v. Arthur Young & Co*. (1992) 3 Cal.4th 370, 396-397.)

The California Supreme Court articulated the test for determining whether to impose a legal duty absent privity of contract in *Biakanja*, *supra*, 49 Cal.2d 647. *Biakanja* involved an action for negligence by the sole beneficiary of a will against a notary public who prepared a will that turned out to be ineffective for lack of proper attestation.  (*Id.* at p. 648.)  The issue before the *Biakanja* court was whether the notary was "under a duty to exercise due care to protect [sole beneficiary] from injury and was liable for damage caused [to the sole beneficiary] by his negligence *even though they were not in privity of contract*."  (*Ibid.,* italics added.)

17

In considering whether the notary had owed duty of care to the sole beneficiary, the *Biakanja* court noted that "[i]mposition of liability for injuries to intangible interests has been refused . . . in the absence of privity where any potential advantage to the plaintiff from the performance of the contract was only a collateral consideration of the transaction or where the injury to the particular person bringing suit was not foreseeable." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.)  Based on this observation, the California Supreme Court articulated the test for determining the existence of a legal duty as follows:  "The determination whether in a specific case the defendant will be held liable *to a third person not in privity* is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him [or her], the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Id.* at p. 650, italics added.)  Applying this test, the *Biakanja* court held the notary owed the sole beneficiary a duty of care and directly caused injury to the beneficiary. (*Id.* at p. 651.)

In *Nymark v. Heart Fed. Savings & Loan Assn*. (1991) 231 Cal.App.3d 1089 (*Nymark*), this court held that, "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money.  (*Wagner v. Benson* (1980) 101 Cal.App.3d 27, 34–35; *Fox & Carskadon Financial Corp. v. San Francisco Fed. Sav. & Loan Assn.* (1975) 52 Cal.App.3d 484, 488, 489; *Bradler v. Craig* (1969) 274 Cal.App.2d 466, 473, 476.)  Thus, for example, a lender has no duty to disclose its knowledge that the borrower's intended use of the loan proceeds represents an unsafe investment. (*Wagner v. Benson, supra*, 101 Cal.App.3d at pp. 33–35.)  'The success of the [borrower's] investment is not a benefit of the loan agreement which the [lender] is

under a duty to protect [citation].' (*Id.*, at p. 34.) 'Liability to a borrower for negligence arises only when the lender "actively participates" in the financed enterprise "beyond the domain of the usual money lender." ' (*Id.*, at p. 35; quoting *Connor v. Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 864.)" (*Nymark*, *supra*, at p. 1096.) Thus, this court held that a lender preparing an appraisal for the lender's own benefit did not owe a duty of care to the borrower to ensure the accuracy of the appraisal of a residence. (*Id.* at p. 1092, fn. omitted.)

In *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872 (*Jolley*), the First District acknowledged the general rule that a financial institution does not owe a borrower a duty of care when acting in its conventional rule as a lender of money. (*Id.* at p. 898.) However, the *Jolley* court stated, "considered in full context, the cases show the question is not subject to black-and-white analysis—and not easily decided on the 'general rule.' " (*Ibid.*) The context in which a duty of care was considered in *Jolley* involved a construction loan rather than a residential mortgage "where, save for possible loan servicing issues, the relationship ends when the loan is funded." (*Id.* at p. 901.) *Jolley* involved a construction loan where "the relationship between lender and borrower is ongoing, in the sense that the parties are working together over a period of time, with disbursements made throughout the construction period, depending upon the state of progress towards completion." (*Ibid.*) Based on this ongoing relationship, the *Jolley* court concluded: "We see no reason why a negligent failure to fund *a construction loan*, or negligent delays in doing so, would not be subject to the same standard of care" as a bank that acquires a loan through purchase of a failed bank and thereby also acquires a duty to investigate the history of the loan. (*Ibid.*, italics added.)

Although the *Jolley* rule of decision arises in the context of a construction loan in which the borrower and lender have a continuing working relationship, that decision went on to opine that "[e]ven when the lender is acting as a conventional lender, the no-duty

19

rule is only a general rule." (213 Cal.App.4th at p. 901.) *Jolley* thus questions this court's prior holding in *Nymark, supra,* 231 Cal.App.3d 1089 on grounds a lender may be liable for negligence in its handling of a loan transaction even when acting within its traditional role as only a lender of money. (*Jolley* at pp. 901-902.)

This dicta in *Jolley, supra,* 213 Cal.App.4th 872 was rejected by the Fourth District in *Lueras*, *supra*, 221 Cal.App.4th at pages 66 to 67. The *Lueras* court considered the same question as presented in this case, namely whether a residential mortgage lender has a duty of care in handling an application for a loan modification. (*Id.* at p. 62.) The *Lueras* court declined to impose a judicially created duty of care because "[a] lender's obligations to offer, consider, or approve loan modifications and to explore foreclosure alternatives are created solely by the loan documents, statutes, regulations, and relevant directives and announcements from the United States Department of the Treasury, Fannie Mae, and other governmental or quasi-governmental agencies." (*Id.* at p. 67.) *Lueras* held that "a loan modification is the renegotiation of loan terms, which falls squarely within the scope of a lending institution's conventional role as a lender of money." (*Ibid.*) In so holding, the *Lueras* court explained the *Biakanja* test also precluded the imposition of a duty of care because "[i]f the modification was necessary due to the borrower's inability to repay the loan, the borrower's harm, suffered from denial of a loan modification, would not be closely connected to the lender's conduct. If the lender did not place the borrower in a position creating a need for a loan modification, then no moral blame would be attached to the lender's conduct." (*Lueras*, at p. 67.)

The First District subsequently reached the opposite conclusion, holding lenders have a legal duty of care when processing loan modification applications from their borrowers. (*Alvarez v. BAC Home Loans Servicing, L.P*. (2014) 228 Cal.App.4th 941, 948 (*Alvarez*).) Several federal district courts in California have considered the issue

20

under California law and reached conflicting conclusions about whether lenders owe borrowers a duty of care to avoid negligent handling of a loan modification applications. (Compare e.g., *Odle v. MGC Mortgage Inc.*, *No. C 15-5019, 2015 U.S. Dist. Lexis 136367, 2016 WL 2858764 (C.D. Cal., May 16, 2016)* at *3 (holding no duty of care exists); *Griffin v. Green Tree Servicing, LLC*, *No. C 14-9408, 2015 U.S. Dist. Lexis 136367, 2015 WL 10059081 (C.D. Cal. Oct. 1, 2015)* at *14 (same); *Carbajal v. Wells Fargo Bank, N.A.*, *No. C 14-7851, 2015 U.S. Dist. Lexis 47918, 2015 WL 2454054 (C.D. Cal., Apr. 10, 2015)* at *6 (same) with *Miller v. Wells Fargo*, *No. C 14-3392, 2015 U.S. Dist. Lexis 114171, 2015 WL 5074466 (C.D. Cal. Aug. 27, 2015)* at *6–7 (holding a duty of care exists); *Hatton v. Bank of America*, *No. C 15-0187, 2015 U.S. Dist. Lexis 89448, 2015 WL 4112283 (E.D. Cal. July 8, 2015)* at *9-10 (same); *Garcia v. Ocwen Loan Servicing, LLC, No. C 10-0290, 2010 U.S. Dist. Lexis 45375, 2010 WL 1881098 (N.D. Cal., May 10, 2010)* at *3 (same).) Having surveyed these decisions, we continue to adhere to our holding in *Nymark, supra,* 231 Cal.App.3d 1089.

The decisions in which the courts have held a duty of care exists applied the *Biakanja* factors to conclude a common law duty exists even though there was a contractual relationship. (E.g., *Alvarez, supra*, 228 Cal.App.4th at p. 948 [applying *Biakanja* test without noting the test was formatted for situations in which there is no privity of contract]; see also *Miller v. Wells Fargo*, *supra*, 2015 WL 5074466, at p. *7 [same]; *Hatton v. Bank of America*, *supra*, 2015 WL 4112283, at p. *10 [same]; *Garcia v. Ocwen Loan Servicing, LLC, supra,* 2010 WL 1881098, at *3 [same].) This was not the correct approach because these factors do not apply where the parties are in a contractual relationship.

As the California Supreme Court's decision in *Biakanja, supra,* made clear, the test is intended for situations where there is no privity of contract. (49 Cal.2d at p. 650.) In situations where there *is* privity of contract, the *Biakanja* test is inapposite because

21

there is already a remedy:  breach of contract.  In *Biakanja*, the test for a tort duty was necessary because the sole beneficiary of the will had no contractual remedy against the notary.  (*Id.* at p. 648.)  By contrast, the federal district courts that hold there is a duty of care to avoid negligence in a purely contractual relationship such as between a residential mortgage lender and the borrower are injecting a tort remedy even though the parties are necessarily in privity of contract.

The California Supreme Court explored the problematic nature of injecting tort remedies into a breach of contract action in *Robinson Helicopter Co., Inc. v. Dana Corp*. (2004) 34 Cal.4th 979 (*Robinson Helicopter*).  *Robinson Helicopter* involved the question of whether a tort remedy is available even when a breach of contract action provides relief for a defective product.  (*Id.* at p. 992.)  There, the Supreme Court noted the importance of " 'prevent[ing] the law of contract and the law of tort from dissolving one into the other.' "  (*Id.* at p. 988.)  The *Robinson Helicopter* court held a plaintiff may state a tort claim for an *intentional* tort even when the same conduct gives rise to contract remedies.  The Supreme Court allowed a Robinson Helicopter Company to sue its parts manufacturer for fraud and *intentional* misrepresentation based on the improper certification that parts conformed to design specifications.  (*Id.* at p. 992.)  Unlike *Robinson Helicopter*, the negligence claim at issue here and in *Alvarez* do not involve an intentional tort.  Consequently, the courts that have imputed a duty of care have erred in relying on an inapplicable test to inject a tort duty into a contractual relationship in the absence of an intentional tort.

Here, the Conroys had a contractual relationship with Wells Fargo at all times relevant to their negligence claim.  Under the California Supreme Court's guidance in *Biakanja, supra,* 49 Cal.2d 647 and *Robinson Helicopter, supra,* 34 Cal. 4th 979, we decline to apply a test intended only for situations where there is no privity of

22

contract. Accordingly, the trial court properly dismissed the Conroys' negligence cause of action.

## III

### *Promissory Estoppel*

The Conroys contend the trial court erred in dismissing their cause of action for promissory estoppel because "on five different occasions" Wells Fargo "explicitly and unambiguously promised [the Conroys] that if [they] submitted their financial documents, [Wells Fargo] would review [the Conroys] for a HAMP loan modification under HAMP guidelines." We conclude the Conroys' operative complaint does not allege a necessary element of promissory estoppel, namely detrimental reliance.

" ' "The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his [or her] reliance.' " ' " (*Daniels*, *supra*, 246 Cal.App.4th 1150, 1178, quoting *Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 945.)

As to the cause of action for promissory estoppel, the Conroys' operative complaint alleges actual reliance by "consistently (and constantly) sending hundreds of pages of financial documents," "expended countless hours in the process of copying, faxing and shipping the same documents" to Wells Fargo, and gave Wells Fargo "access to personal financial data that [Wells Fargo] was otherwise not entitled to receive." As a consequence, the Conroys asserted they suffered "increased arrears, interests and penalties, as well as damage to their credit."

Although the Conroys allege they expended efforts in pursuing the loan modification, their operative complaint does not explain what they might have done otherwise to avoid foreclosure. In other words, the Conroys do not state how they

23

changed their position to their detriment by surrendering other options in reliance of promises by Wells Fargo. The operative complaint is devoid of how the Conroys might otherwise have escaped the damages they allege as deriving from breach of Wells Fargo's promises. To the contrary, as we have noted, the Conroys did not suffer foreclosure due to statements or conduct by Wells Fargo, but because the Conroys became unable to afford their mortgage payments. The Conroys pursued loan modification based on their own financial necessity rather than on Wells Fargo's promises. For lack of the element of detrimental reliance, the trial court properly dismissed the Conroy's cause of action for promissory estoppel.

## IV

### *Civil Code section 2923.6*

The Conroys next argue the trial court erred in dismissing their cause of action under section 2923.6. We conclude section 2923.6 does not apply to the Conroys.

### A.

### *Section 2923.6 Generally Applies Only to First Lien Modification Application*

The HBOR became effective on January 1, 2013. (See *Lueras*, *supra*, 221 Cal.App.4th at p. 86, fn. 14 [noting the effective date].) As part of this action, section 2923.6 was amended to provide in pertinent part: "(g) In order to minimize the risk of borrowers submitting multiple applications for first lien loan modifications for the purpose of delay, *the mortgage servicer shall not be obligated to evaluate applications from borrowers who have already been evaluated or afforded a fair opportunity to be evaluated for a first lien loan modification prior to January 1, 2013*, or who have been evaluated or afforded a fair opportunity to be evaluated consistent with the requirements of this section, unless there has been a material change in the borrower's financial circumstances since the date of the borrower's previous application and that change is documented by the borrower and submitted to the mortgage servicer." (Italics added.)

24

### *The Conroys' Claim under Section 2923.6*

As to the cause of action under section 2923.6, the Conroys' alleged they "never received a written determination that this final review [in July 2013] ended in a denial of their HAMP modification, in violation of . . . §2923.6(f)." The Conroys further alleged, "during that time, as [their] modification application and appeal was still under review, [Wells Fargo] noticed and/or caused to be noticed a new Trustee's Sale date of August 14, 2013, in violation of . . . §2923.6(c)."

The trial court dismissed this cause of action on grounds subdivision (g) of section 2923.6 applies only to a first modification application. The trial court reasoned that "the Legislative intent appears to be to bar the application of Section 2923.6 in instances where the borrower was denied a loan modification prior to the effective date of the [HBOR]; to bar application of the requirements of this Section to applications for loan modifications submitted after the first application was denied; and to prevent lenders being exposed to operation of this statute in the event of multiple applications for loan modification." As the trial court found, "The first application for loan modification was admittedly denied on January 12, 2011, nearly two years before the effective date of the [HBOR]. That denial was admittedly followed by four more denials of loan modification prior to January 1, 2013. There was an apparently material change after the first loan modification denial and before the last two denials, which occurred approximately 1 ½ years prior to the effective date of the [HBOR] when [the Conroys] filed for bankruptcy protection. The provisions of Section 2923.6 simply do not apply under the facts alleged and the court can not envision how the fatal defect can be remedied by amendment."

The record supports the trial court's findings and conclusion. The operative complaint expressly pleads several loan modification applications prior to January 1,

2013. However, the Conroys do not allege changed circumstances between the pre-HBOR loan modification attempt and the post-HBOR loan modification attempts. As a consequence, the trial court correctly concluded subdivision (g) of section 2923.6 barred the Conroys' cause of action.

## V

### *Section 2923.7*

The Conroys contend the trial court erred in dismissing their cause of action under section 2923.7, which requires a loan servicing company to provide a single point of contact "upon request from a borrower." We conclude the trial court properly dismissed the cause of action because the Conroys failed to allege they requested a single point of contact as required by section 2923.7.

### A.

### *Request for Single Point of Contact*

When presented with an issue of statutory interpretation, "we must 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' (*Dyna–Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 (hereafter *Dyna–Med* ).) In undertaking this determination, we are mindful of this court's limited role in the process of interpreting enactments from the political branches of our state government. In interpreting statutes, we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law, ' " 'whatever may be thought of the wisdom, expediency, or policy of the act.' " ' (*People v. Weidert* (1985) 39 Cal.3d 836, 843, quoting *Woodmansee v. Lowery* (1959) 167 Cal.App.2d 645, 652.) '[A]s this court has often recognized, the judicial role in a democratic society is fundamentally to interpret laws, not to write them. The latter power belongs primarily to the people and the political branches of government . . . .' (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 675 (conc. opn. by Werdegar, J.).)" (*California Teachers Assn. v. Governing Bd. of*

26

*Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632-633.) With these principles in mind, we examine section 2923.7.

Enacted as part of the HBOR (Stats. 2012, ch. 86, § 9), section 2923.7 requires loan servicers to provide residential mortgage borrowers with a "single point of contact" for their communications regarding their loans. In pertinent part, section 2923.7 provides:

"(a) *Upon request from a borrower* who requests a foreclosure prevention alternative, the mortgage servicer shall promptly establish a single point of contact and provide to the borrower one or more direct means of communication with the single point of contact." (Italics added.)

The Conroys contend the italicized portion of subdivision (a) does not require homeowners to expressly request a single point of contact. In their view, merely requesting a loan modification implicitly triggers the single point of contact requirement in subdivision (a) of section 2923.7. The Attorney General argues the same. Well Fargo counters that a borrower must expressly request a single point of contact. Otherwise, the italicized language would be mere surplusage because subdivision (a) additionally identifies the object of the sentence as "a borrower *who requests* a foreclosure prevention alternative . . . ." (Italics added.) And, although we have not located any prior reported decisions of a California court on this issue, several federal district courts in California have come to conflicting conclusions as to whether a borrower must make an affirmative request to trigger the single point of contact requirement. (See *Green v. Cent. Mortg. Co.* (N.D. Cal. 2015) 148 F.Supp.3d 852, 874 [collecting conflicting decisions by federal district courts].)

We conclude the plain meaning of the language employed by subdivision (a) of section 2923.7 is that borrowers must make an express request for a single point of contact to trigger the requirement. The Legislature requires the single point of contact

27

only "[u]pon request from a borrower." (§ 2923.7, subd. (a).) If the single point of contact requirement were automatically triggered by the loan modification process, there would be no need to condition the requirement on a "request from the borrower." Instead, the statute would more simply and concisely be written, "Whenever a borrower applies for a foreclosure prevention alternative, the mortgage servicer shall promptly establish a single point of contact . . . ."

We reject the arguments that the language, "[u]pon request from a borrower" pertains to a request – not for a single point of contact – but for a loan modification or other foreclosure prevention alternative. The flaw in this argument is that it ignores the fact the language of subdivision (a) uses the word "requests" twice when it states: "Upon *request* from a borrower who *requests* a foreclosure prevention alternative . . . ." (§ 2923.7, subd. (a), italics added.) Clearly, the second use of the term "requests" is to identify the borrower as a borrower who is pursuing a loan modification or other alternative to foreclosure. If the first use of the term "requests" means the same thing by merely referring to a borrower who requests a foreclosure alternative, then the first "requests" is redundant and constitutes mere surplusage. We decline to adopt a reading that renders part of subdivision (a) mere surplusage. "Interpretations that lead to absurd results or render words surplusage are to be avoided." (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037, quoting *People v. Loeun* (1997) 17 Cal.4th 1, 9.)

Instead of focusing on the language, the Conroys focus on the purpose of the HBOR to provide protections for homeowners seeking to avoid foreclosure for their residences. For example, in *Jones v. Aegis Wholesale Corp. No. C 15-1134, 2015 U.S. Dist. Lexis 169631, 2015 WL 9260837* (*E.D. Cal. Dec. 18, 2015*), the Eastern Distinct rejected "a result [that] would contravene the statutory purpose of ensuring that 'borrowers are considered for, and have a meaningful opportunity to obtain, available

28

loss mitigation options.' " (*Id.* at p. *3.) The gravamen of this line of thinking is that the HBOR should be construed to provide maximum protections to homeowners. Under this view, the possibility that homeowners could benefit from a single point of contact compels the conclusion homeowners should receive that benefit even without asking. (See *Alvarez*, *supra*, 228 Cal.App.4th at p. 948 [noting "[t]he existence of a public policy of preventing future harm to home loan borrowers" and citing press releases regarding legislation dealing with mortgage foreclosures].)

The prerogative to set public policy lies with the Legislature, which may decide to solve a problem in piecemeal fashion or provide options that individuals must affirmatively request. (See *Saltonstall v. City of Sacramento* (2014) 231 Cal.App.4th 837, 854-855; *Brandwein v. California Bd. of Osteopathic Examiners* (9th Cir. 1983) 708 F.2d 1466, 1471–72 [noting "that the legislature may take piecemeal steps which only partially ameliorate a perceived evil and create some disparate treatment of affected parties"].) When the language of the statute is clear and unambiguous, we respect that legislative expression of intent. Accordingly, we adhere to the plain meaning of subdivision (a) of section 2923.7 that requires the homeowner to affirmatively request a single point of contact.

## B.

### *The Conroys Did Not Request a Single Point of Contact*

The Conroys' operative complaint does not allege they ever requested a single point of contact. In their appellate briefing, the Conroys do not state they can amend their cause of action to allege they requested a single point of contact. Because the Conroys do not identify any facts they can add by way of amendment to state a valid cause of action under section 2923.7, we conclude the trial court properly dismissed the claim with prejudice. (*HFH, Ltd. v. Superior Court of Los Angeles* (1975) 15 Cal.3d 508, 513, fn. 3.)

29

# VI

## *Unfair Competition Law Claim*

The Conroys contend the trial court erroneously dismissed their UCL cause of action. " ' "The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.' (*Kwikset Corp. v. Superior Court* [(2011)] 51 Cal.4th [310,] 320.) 'A plaintiff may pursue a UCL action in order to obtain either (1) *injunctive relief*, "the primary form of relief available under the UCL," or (2) *restitution* ' "as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.' " ' (*Jenkins v. JPMorgan Chase Bank* (2013) 216 Cal.App.4th 497, 520.)" (*Daniels, supra,* 246 Cal.App.4th at p. 1186.) When a UCL claim is derivative of other substantive causes of action, the claim "stand[s] or fall[s] depending on the fate of the antecedent substantive causes of action." (*Krantz v. BT Visual Images, L.L.C.* (2001) 89 Cal.App.4th 164, 178.)

Here, the Conroys acknowledge their cause of action for violation of the UCL was solely derivative of their causes of action for fraud and violation of section 2923.7. Having determined the trial court properly dismissed all of their other causes of action, we conclude the Conroys' derivative UCL claim was also properly dismissed.

# VI

## *Cause of Action for Declaratory Relief*

In their reply brief, the Conroys purport to "repeat their request to amend their declaratory relief cause of action to state a claim for wrongful foreclosure . . . ." However, the Conroys' opening brief declares they "do not appeal the judgment as it relates to their . . . ninth cause of action for declaratory relief." Having surrendered the cause of action in their opening brief, the Conroys cannot revive the claim in their reply brief. " 'Obvious considerations of fairness in argument demand that the appellant

present all of his [or her] points in the opening brief.  To withhold a point until the closing brief would deprive the respondent of his [or her] opportunity to answer it or require the effort and delay of an additional brief by permission.  Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764, quoting *Neighbors v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)  Accordingly, we reject the Conroys' attempt to resurrect their declaratory relief cause of action.

DISPOSITION

The judgment of dismissal is affirmed.  Wells Fargo Bank, N.A., Fidelity National Title Insurance Company aka Default Resolution Network, LLC, and HSBC Bank USA, N.A. as trustee for Merrill Lynch Mortgage Backed Securities Trust, Series 2007-2 shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)

 

 

 

 

_____/s/_____<br>HOCH, J.

 

 

We concur:

 

 

_____/s/_____
RAYE, P. J.

 

 

_____/s/_____
BLEASE, J.

31